## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

THE BRADY CENTER TO PREVENT GUN
VIOLENCE,

        Plaintiff

vs.

U.S. DEPARTMENT OF JUSTICE

and

BUREAU OF ALCOHOL, TOBACCO,
FIREARMS AND EXPLOSIVES,

        Defendants.

Case No.  1:17-cv-02130 (RDM)

## MEMORANDUM OF POINTS AND AUTHORITIES IN
## OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL
## SUMMARY JUDGMENT AND IN SUPPORT OF PLAINTIFF'S
## CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT

Kevin T. Barnett (D.C. Bar No. 1003410)
Alan Pemberton (D.C. Bar No. 367108)
Nooree Lee (D.C. Bar No. 1001687)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street NW
Washington, DC 20001
(202) 662-5430
kbarnett@cov.com

Jonathan E. Lowy (D.C. Bar No. 418654)
Joshua Scharff (D.C. Bar No. 999392)
BRADY CENTER TO PREVENT GUN VIOLENCE
840 First Street NE Suite 400
Washington, DC 20002
(202) 370-8106
jscharff@bradymail.org

*Attorneys for Plaintiff Brady Center to Prevent Gun
Violence*

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................. 1

BACKGROUND .................................................................................................. 3

STANDARD OF REVIEW .................................................................................. 7

ARGUMENT ....................................................................................................... 8

I.  The Agency Failed to Meets Its Burden to Show that the White Paper FOIA Request
    Searches Were Adequate. ............................................................................ 8

    A.  The Agency Has Failed to Show that Allowing Mr. Turk's Undirected Self-
        Collection of Some Responsive Records Resulted in an Adequate Search .......... 11

    B.  The Agency Has Failed to Show that the Use of a Single Search Term on a Select
        Number of Custodians Constitutes an Adequate Search ..................................... 13

II.  The Agency Failed to Justify Its Withholding of Records Responsive to the White Paper
     Request .................................................................................................. 16

    A.  The Agency Has Failed to Meet its Burden That It Properly Redacted Records
        Under the Deliberative Process Privilege ........................................................ 16

    B.  The Agency Has Failed to Justify its Withholding of Responsive Records as "Out
        of Scope" .................................................................................................. 18

III.  The Agency Failed to Justify Its Redaction of Records Responsive to the Warning Letter
      Request (Jan. 30, 2018; Mar. 9, 2018; Apr. 9, 2018 Productions) ................................. 20

    A.  The Agency Failed to Meet Its Burden Because It Has Not Provided a Vaughn
        Index ...................................................................................................... 21

    B.  The Withheld Information Does Not Fall Within the Tiahrt Amendment .......... 23

CONCLUSION .................................................................................................... 30

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abdeljabbar v. Bureau of Alcohol, Tobacco & Firearms,*
  74 F. Supp. 3d 158, 173 (D.D.C. 2014) ........................................................................................24, 28

*Aguirre v. SEC,*
  551 F. Supp. 2d 33 (D.D.C. 2008) ..........................................................................................................9, 12

*Am. Ctr. for Equitable Treatment, Inc. v. Office of Mgmt. & Budget,*
  281 F. Supp. 3d 144, 152 (D.D.C. 2017) ....................................................................................10, 13

*Am. Fed'n of Gov't Employees, Local 812 v. Broad. Bd. of Governors,*
  711 F. Supp. 2d 139 (D.D.C. 2010) ...............................................................................................................9

*American Immigration Lawyers Association v. EOIR,*
  830 F.3d 667 (D.C. Cir. 2016) ..........................................................................................................................19

*Asarco, Inc. v. EPA,*
  No. 08–1332, 2009 WL 1138830 (D.D.C. Apr. 28, 2009) ............................................10, 14

*Bigwood v. U.S. Dep't of Def.,*
  132 F. Supp. 3d 124, 140 (D.D.C. 2015) ......................................................................................9, 15

*Caruso v. U.S. Bureau of Alcohol, Tobacco & Firearms,*
  495 F. App'x 776 (9th Cir. 2012) ..........................................................................................................25

*The Center for Investigative Reporting v. United States,*
  C.A. No. 3:17-cv-06557-JSC, Dkt. No. 39 (July 10, 2018) ........................................29, 30

*Chesapeake Bay Foundation, Inc. v. U.S. Army Corps of Engineers,*
  722 F. Supp. 2d 66 (D.D.C. 2010) .............................................................................................................16

*CIA v. Sims,*
  471 U.S. 159 (1985) .................................................................................................................................................22

*Citizens for Responsibility & Ethics in Washington v. U.S. Dep't of Justice,*
  955 F. Supp. 2d 4 (D.D.C. 2013) ..............................................................................................................21, 23

*Coastal States Gas Corp. v. Dep't of Energy,*
  617 F.2d 854 (D.C. Cir. 1980) ........................................................................................................................16

*Cobell v. Norton,*
  213 F.R.D. 1 (D.D.C. 2003) ..............................................................................................................................16

*Coffey v. Bureau of Land Management,*
  277 F. Supp. 3d 1, 7 (D.D.C. 2017) ...........................................................................................9, 10, 20

*Defs. of Wildlife v. U.S. Border Patrol,*
  623 F. Supp. 2d 83 (D.D.C. 2009) ..............................................................................................................9, 12

*Dep't of Air Force v. Rose*,
     425 U.S. 352 (1976) .................................................................................................8, 25

*Dep't of State v. Ray*,
     502 U.S. 164 (1991) .......................................................................................................25

*Ecological Rights Foundation v. Federal Emergency Management Agency*,
     16-cv-0524, 2017 WL 5972702 (N.D. Cal. Nov. 30, 2017) ...................................17

*Fowlkes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*,
     139 F. Supp. 3d 287, 291 (D.D.C. 2015) ......................................................24, 28

*Hall v. Dep't of Justice*,
     552 F. Supp. 2d 23 (D.D.C. 2008) ............................................................................17

*Heffernan v. Azar*,
     2018 WL 3150214 (D.D.C. June 27, 2018) ...............................................10, 14, 15

*John Doe Agency v. John Doe Corp.*,
     493 U.S. 146 (1989) .......................................................................................................25

*Judicial Watch, Inc. v. Food & Drug Admin.*,
     449 F.3d 141 (D.C. Cir. 2006) ...................................................................................16

*Judicial Watch, Inc. v. Kerry*,
     844 F.3d 952 (D.C. Cir. 2016) ...................................................................................13

*Judicial Watch, Inc. v. U.S. Postal Service*,
     297 F. Supp. 2d 252 (D.D.C. 2004) ..........................................................................17

*Katzman v. Freeh*,
     926 F. Supp. 316 (E.D.N.Y. 1996) ...........................................................................11

*Meyer v. BOP*,
     940 F. Supp. 9 (D.D.C. 1996) ....................................................................................11

*Morley v. CIA*,
     508 F.3d 1108 (D.C. Cir. 2007) ...................................................................................8

*Nat'l Archives & Records Admin. v. Favish*,
     541 U.S. 157 (2004) ........................................................................................................2

*Nat'l Ass'n of Home Builders v. Norton*,
     309 F.3d 26 (D.C. Cir. 2002) .......................................................................................8

*Nat'l Sec. Counselors v. CIA*,
     960 F. Supp. 2d 101 (D.D.C. 2013) ..........................................................................22

*National Day Laborer Organizing Network v. U.S. Immigration & Customs Enforcement*,
     877 F. Supp. 2d 87 (S.D.N.Y. 2012) .........................................................................11

*National Resources Defense Council v. Dep't of Defense*,
     388 F. Supp. 2d 1086 (C.D. Cal. 2005) ...................................................................17

*NLRB v. Robbins Tire & Rubber Co.*,
    437 U.S. 214 (1978)..................................................................................................................1

*Oglesby v. U.S. Dep't of the Army*,
    920 F.2d 57 (D.C. Cir. 1990)....................................................................................................8

*Parker v. ICE*,
    238 F. Supp. 3d 89, 104 (D.D.C. 2017)..................................................................................13

*Parker v. United States Dep't of Justice, Office of Prof'l Responsibility*,
    278 F. Supp. 3d 446, 451–52 (D.D.C. Aug. 16, 2017) ..........................................................20

*Physicians for Human Rights v. U.S. Dep't of Def.*,
    675 F. Supp. 2d 149 (D.D.C. 2009)..........................................................................................9

*Pulliam v. EPA*,
    235 F. Supp. 3d 179, 188-89 (D.D.C. 2017)......................................................................9, 15

*Reep v. United States Dep't of Justice*,
    302 F. Supp. 3d 174, 183 (D.D.C. 2018)............................................................................24, 28

*Steinberg v. Dep't of Justice*,
    23 F.3d 548 (D.C. Cir. 1994)..............................................................................................7, 19

*Tushnet v. ICE*,
    246 F. Supp. 3d 422, 434–35 (D.D.C. 2017)..........................................................................13

*Valencia-Lucena v. Coast Guard*,
    180 F.3d 321 (D.C. Cir. 1999)..................................................................................................9

*Wiesner v. FBI*,
    577 F. Supp. 2d 450 (D.D.C. 2008)........................................................................................10

## <u>INTRODUCTION</u>

Plaintiff, the Brady Center to Prevent Gun Violence ("Brady Center") filed this lawsuit to compel a response from the Bureau of Alcohol Tobacco Firearms and Explosives ("ATF" or the "Agency") to two FOIA requests submitted in March 2017 and August 2017, respectively.  The first requested records related to a policy memorandum about potential gun policy shifts authored by then Acting Deputy Director Ronald Turk (the "White Paper Request").  The second request sought records related to inspections of federally-licensed gun dealers (the "Warning Letter Request").  While the Agency has disclosed some records, its searches to date have been inadequate -- relying on the single search term "white paper" of emails from 13 of about 100 individuals who had copies of the White Paper.  Even the records it has disclosed have been inadequate -- replete with unjustifiable redactions.

The stories told by the partial disclosures are not flattering to the ATF.  The White Paper FOIA documents show that the ATF's Deputy Director drafted a white paper dated January 20, 2017 after consulting with a gun industry lobbyist about what it should say – and accepting many of his proposed edits to the draft.  The Warning Letter FOIA shows the Agency ignoring time and time again serious repeated violations by federally-licensed gun dealers that allowed dangerous people to obtain firearms and the ATF declining to revoke the license of repeat violators, despite recommendations from first line inspectors to do so.  Unsurprisingly, the Agency's partial productions sparked prominent attention from the New York Times and CNN, among other news sources.  And that is only part of the story.

The Brady Center is entitled to all responsive, non-exempt records so it can tell the public the full story about the ATF's actions.  "The basic purpose of FOIA is to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *NLRB v. Robbins Tire &*

*Rubber Co.*, 437 U.S. 214, 242 (1978). Or as put more bluntly in another Supreme Court decision, FOIA protects the right of all Americans "to 'know what their Government is up to.'" *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 171-72 (2004) (quoting *U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 773 (1989)).

The Agency's efforts in response to the White Paper FOIA have been inadequate, as a matter of law. It has failed to meet its burden that its search was reasonably calculated to locate all responsive documents -- and it cannot meet this burden because its search unreasonably limited the number of custodians to exclude many known to have responsive records, excluded known responsive records that were not identified by the initial search, and relied upon a single search term without explaining why additional terms were unnecessary. Furthermore, it withheld dozens of records as "out of scope" despite the explicit language of the White Paper FOIA and redacted other records without providing the particularizing its justification, as mandated by statute. In short, the Agency has failed to meet its burden under the White Paper FOIA.

Similarly, the Agency's efforts to justify its Exemption 3 redactions in the Warning Letter FOIA have fallen short. It provided no *Vaughn* index or similar itemization of its withholdings, leaving the Brady Center to guess as to the specific justification for each of the numerous redactions. And significantly, the Agency broadly based most of its redactions on an unsupported and expansive reading of a 2012 appropriations rider.

Accordingly, the Brady Center is entitled to partial summary judgment to order the Agency to conduct an adequate search for the White Paper FOIA documents, and lift the unjustified redactions from the Warning Letter FOIA documents.

## BACKGROUND

### A.    WHITE PAPER FOIA REQUEST

On February 6, 2017, the Washington Post reported that Ronald Turk, the second-highest ranking official at the ATF, had written a paper titled "Options to Reduce or Modify Firearms Regulations" ("White Paper") and dated January 20, 2017 – Inauguration Day.[1] *See* Statement of Undisputed Material Facts ("SUMF") ¶ 15.  The Post reported that the White Paper discussed removing restrictions on gun silencers, increasing the number of guns used in the commission of crime that a dealer could sell before triggering additional investigation, and lifting the ban on imported assault weapons.  *Id.* ¶ 16.

After learning of this White Paper, the Brady Center was concerned that its contents were inconsistent with the ATF's duty to enforce the law, and its stated mission "to protect communities from violent criminals, criminal organizations, the illegal use and trafficking of firearms."  The Brady Center also wanted to know if any outside groups or individuals may have been involved in developing the White Paper.  While the contents of the reported White Paper appeared inconsistent with the ATF's mission, it appeared consistent with the gun lobby's agenda of removing and reducing firearms regulations.

So on March 29, 2017, the Brady Center submitted a FOIA request ("the White Paper Request") to the ATF, seeking four categories of records:

> (1) All communications between ATF employees related to the January 20, 2017 White Paper titled "Federal Firearm Regulations - Options to Reduce or Modify Firearms Regulations";
>
> (2) All communications between ATF employees and members of the Presidential Transition Team related to the January 20, 2017 White Paper titled "Federal Firearm Regulations - Options to Reduce or Modify Firearms Regulations";

---

[1]    *See* S. Horwitz, "Senior ATF Official Proposes Loosening Gun Regulations," Wash. Post (Feb. 6, 2017) (Ex. A to the Decl. of Nooree Lee ("Lee Decl.")).

3

(3) All communications between ATF employees and non-government employees, including but not limited to representatives from gun manufacturers or the National Rifle Association, related to the January 20, 2017 White Paper titled "Federal Firearm Regulations - Options to Reduce or Modify Firearms Regulations"; and

(4) All other documents, including drafts, related to the January 20, 2017 White Paper titled "Federal Firearm Regulations - Options to Reduce or Modify Firearms Regulations."

ECF No. 1, at Ex. A (Oct. 16, 2017); *see also* SUMF ¶ 17.

The White Paper Request defined "documents" expansively to include emails, other electronic media, and hardcopy documents as well as any exhibits, attachments, or other documents referenced in responsive documents. *See id.* at 2-3.

On April 4, 2017, the U.S. House of Representatives Committee on Oversight and Government Reform ("House Oversight Committee") questioned Turk about his white paper. *See* SUMF ¶ 18; *see also* Serial No. 115-21. During his testimony, Turk stated that he does not "particularly have a position" on the issues raised in the White Paper and that he does not "necessarily recommend a position on that matter one way or the other for the agency." *Id* at 64.

After the hearing, the Chair of the House Oversight Committee requested additional information about the White Paper. *See* Chisholm Decl. ¶ 4. In response to this demand, the ATF provided a letter from Acting Deputy Director Turk and began a search for related documents. *See* Chisholm Decl. ¶ 5. The letter confirmed that Turk "asked several key members from the gun and explosives industries for feedback [on the White Paper]" including two staff members at the Department of Justice as well as "the National Shooting Sports Foundation, Mark Barnes & Associates, and the National Rifle Association's Institute for Legislative Action." *See* Ex. B to Lee Decl., R. Turk Letter to J. Chaffetz, at 2-3 (Apr. 24, 2017). He also confirmed that he "had several conversations over the past year(s) with the

4

NSSF, Mr. Barnes and others regarding matters discussed in [the] White Paper." *Id.*

The ATF also began to search for documents and communications related to the White Paper. *See* Chisholm Dec. ¶¶ 5-8. According to released documents, the ATF planned to comply with the Committee's demands by searching the files of every ATF employee who received a copy of the White Paper. *E.g.* Ex. E to the Lee Decl., Redacted Email to M. Bennett (Apr. 13, 2017) (Document Prod. at 870-72) (listing as proposed custodians "Ron Turk, Joe Allen, REDACTED, anyone else that the document was circulated to"). At some point, and for unknown reasons, ATF opted to limit its efforts to 13 custodians. Chisholm Dec. ¶ 7. The ATF identified "[r]oughly 1,900 pages" of potentially responsive documents and then culled down the total to 1018 pages after a manual review. Chisholm Decl. ¶ 8.

Over the next six months, the Brady Center repeatedly asked about the status of the White Paper FOIA. *See* ECF No. 1 (Oct. 16, 2017), ¶¶ 16, 17, 18, 19, 20, 21, 22, 23, 24, 25. The ATF repeatedly ignored those inquiries. *See* Def. Answer, ECF No. 7 (Dec. 1, 2017) ¶¶ 16, 18, 20, 23, 25, 27 (admitting the ATF did not respond to the Brady Center's inquiries).

**B.    WARNING LETTER FOIA**

On August 7, 2017, the Brady Center submitted a FOIA request to the ATF seeking records related to ATF correspondence with federal firearm licensees. The request sought two discrete categories of requested records:

> (1) All warning letters, warning conference notices, and the underlying reports of violations and firearms inspection narrative reports, issued to federal firearms licensees from July 1, 2015 through June 30, 2017;
>
> (2) All notices of revocation of license and the accompanying ATF Form 4500s issued to federal firearms licensees from July 1, 2015 through June 30, 2017

ECF No. 1, at Ex. B (Oct. 16, 2017); *see also* SUMF ¶ 27.

The request extends to letters, inspection reports, and notice issued by the Agency and held within the Agency's control. *See id.* ¶¶ 27-28. The Warning Letter Request, however, does

5

not request the federal firearms licensee's ("FFL") records or data pulled directly from the

Agency's Firearms Trace System ("eTrace") database used by law enforcement officials to

submit firearm traces to the National Tracing Center.  *See id.* ¶¶ 30-31.

### C.    PROCEDURAL HISTORY

On October 16, 2017, the Brady Center filed this suit to compel a response to both the

White Paper Request and the Warning Letter Request.  *See* ECF No. 1 (Oct. 16, 2017); Kil

Decl. ¶ 5.  Pursuant to Court orders, the ATF released records in response to the White Paper

FOIA in February 2018 and released additional records in March and May 2018.  *See* Kil Decl.

¶¶ 6-7, 9-10.  The ATF redacted portions of these released records under Exemption 4,

Exemption 5 (deliberative process privilege); Exemption 5 (attorney-client privilege) and

Exemption 6, as well as on the basis that some portions of the documents were "out of scope."[2]

At the same time, the ATF started producing records responsive to the Warning Letter

FOIA request in January 2018 in accordance with the Court's direction at the December 21,

2017 status conference.  The production included redactions on nearly every page, many of

which were based on Exemption (b)(3), under the theory that the Consolidated and Further

Continuing Appropriations Act of 2012 (Public Law 112-55) prohibited the release of the

redacted information.  *See* Kil Decl. ¶¶ 11-20; *see also* SUMF ¶¶ 38.  As ordered by the Court,

the ATF made additional productions in March and April.[3]  As with its initial production, these

productions included redactions on almost every page, many of which were based on

Exemption (b)(3) and mirroring the redactions in its initial production.  *See* Kil Decl. ¶ 11.

---

[2]    The Brady Center is not challenging the Agency's redactions based on Exemption 4,
Exemption 5 (Attorney-Client Privilege) or Exemption 6 in connection with the Warning Letter
FOIA.

[3]    Since April, the Agency has continued to make monthly productions, in compliance with
the Court's Order.  Those additional productions are not part of the exemplar set used for this
partial motion for summary judgment.

The Brady Center sought the Agency's concurrence to file partial summary judgment motions over the formulaic redactions as a way to expedite the resolution of the Warning Letter FOIA at the same time the parties resolved the White Paper FOIA disputes.  But the Agency preferred to delay motions practice on the Warning Letter FOIA until Spring 2019, forcing the Brady Center to seek the Court's assistance.  *See* Mot. for Scheduling Order, ECF No. 13 (May 25, 2018).

In its Motion for a Scheduling Order, the Brady Center identified three unresolved issues from the White Paper FOIA: (1) the adequacy of the Agency's search; (2) its improperly withholding documents as "out of scope"; and (3) its inadequate justification of deliberative process privilege redactions.  *Id.* at 5.  The Motion for a Scheduling Order also requested a briefing schedule "to resolve the (b)(3) redaction issues from the first three Warning Letter FOIA productions (Jan. 30, 2018; March 9, 2018; and April 9, 2018)."  *Id.* at 6.

After hearing from the parties, the Court entered a briefing schedule for summary judgment motions to resolve these issues identified in the Brady Center's Motion for a Scheduling Order.  *See* Minute Order (June 25, 2018).

## STANDARD OF REVIEW

Summary judgment is warranted where material facts are not in genuine dispute and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  Here, as in all FOIA actions, the Agency has the burden to show that it has conducted a search "reasonably calculated to uncover all relevant documents" and has released all non-exempt, non-excluded records identified by that search.  *Steinberg v. Dep't of Justice*, 23 F.3d 548, 551 (D.C. Cir. 1994); 5 U.S.C. § 552(a)(4)(B) ("the burden is on the agency to sustain its action").

When withholding documents under a FOIA exemption, an agency must show that the withheld documents fall within one of the statutory exemptions to FOIA.  *Weisberg*, 705 F.2d at

1351.  In analyzing whether the government has met its burden, courts construe the exemptions

narrowly, with doubts resolved in favor of disclosure . *Dep't of Air Force v. Rose*, 425 U.S. 352,

361 (1976).  In fact, "[a]t all times courts must bear in mind that FOIA mandates a 'strong

presumption in favor of disclosure'" *Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26, 32

(D.C. Cir. 2002) (quoting *Dep't of State v. Ray*, 502 U.S. 164, 173 (1991)).

## <u>ARGUMENT</u>

**I.**     **The Agency Failed to Meets Its Burden to Show that the White Paper FOIA Request Searches Were Adequate.**

The Agency's searches for records responsive to the White Paper FOIA was inadequate,

as it left many stones unturned that are likely to contain responsive records.  In its first search,

the Agency tasked Mr. Turk to conduct a self-collection of his personal email files without any

direction or oversight.  *See* SUMF ¶¶ 23-24.  The Agency then failed to re-examine its search

efforts after identifying references to responsive, undisclosed records in the document

production.  *Id.* ¶¶ 20-22.  In its second search, it used one single search term to review the email

records (but not other electronic or paper records) of a fraction of the known recipients of the

White Paper.  Furthermore, the Agency attempts to justify its inadequate searches with

conclusory statements and blind reliance on a certification provided to Congress.  An agency

must do more to meet its obligations under FOIA.

The Agency bears the burden of proving that it made "a good-faith effort to conduct a

search for the requested records, using methods which can be reasonably expected to produce the

information requested."  *Oglesby v. U.S. Dep't of the Army*, 920 F.2d 57, 68 (D.C. Cir. 1990).

"The court applies a 'reasonableness' test to determine the 'adequacy' of a search methodology,

consistent with congressional intent tilting the scale in favor of disclosure'" *Morley v. CIA*, 508

F.3d 1108, 1114 (D.C. Cir. 2007) (quoting *Campbell v. DOJ*, 164 F.3d 20, 27 (D.C. Cir. 1998)).

"An agency fulfills its obligations under FOIA if it can demonstrate beyond material doubt that

its search was 'reasonably calculated to uncover *all* relevant documents.' " *Valencia-Lucena v. Coast Guard*, 180 F.3d 321, 325 (D.C. Cir. 1999) (quoting *Truitt v. Dep't of State*, 897 F.2d 540, 542 (D.C. Cir. 1990) (emphasis added)).

To meet this burden, the agency must detail its search efforts including where it searched and the methods it used.  *See Aguirre v. SEC*, 551 F. Supp. 2d 33, 61 (D.D.C. 2008) (describing agency's declaration as inadequate because declaration failed to provide search terms or methods used); *Defs. of Wildlife v. U.S. Border Patrol*, 623 F. Supp. 2d 83, 92 (D.D.C. 2009) (rejecting a declaration that "simply states that searches were conducted" without providing search terms). And for any decision to limit the search, the agency must explain why the search remains reasonably calculated to uncover all relevant documents.

For example, it is unreasonable to search only electronic documents when a request specifically asks for paper and electronic documents.  *See Am. Fed'n of Gov't Employees, Local 812 v. Broad. Bd. of Governors*, 711 F. Supp. 2d 139, 153 (D.D.C. 2010) ("The agency's determination that it was worthwhile to search those individuals' digital files was reason enough to suggest that their paper files might also contain responsive documents."); *Pulliam v. EPA*, 235 F. Supp. 3d 179, 188-89 (D.D.C. 2017) (finding that search was inadequate because it limited the search to email only despite clear instructions in the request to search other types of documents).

Similarly, an agency's selection of search terms must pass muster under "a standard of reasonableness." *Physicians for Human Rights v. U.S. Dep't of Def.*, 675 F. Supp. 2d 149, 164 (D.D.C. 2009); *see also Bigwood v. U.S. Dep't of Def.*, 132 F. Supp. 3d 124, 140 (D.D.C. 2015) (holding that the court must confirm that the agency's choice of search terms was "reasonably calculated to lead to responsive documents.").  In *Coffey v. Bureau of Land Management*, the court found that the agency selected unreasonable search terms because it was unable to explain why the selected terms would likely capture all relevant documents.  249 F. Supp. 3d 488

9

(D.D.C. 2017).  It based this analysis in part on the plaintiffs identifying reasonable search terms that would identify responsive documents not captured by the Agency's search terms.  In *American Center for Equitable Treatment*, the court rejected the search terms selected by the agency because the agency offered conclusory statements about how the terms were tailored. *Am. Ctr. for Equitable Treatment, Inc. v. Office of Mgmt. & Budget*, 281 F. Supp. 3d 144, 152 (D.D.C. 2017) (rejecting as conclusory the agency's statement that "staff concluded that the search terms utilized were reasonably tailored to uncover all responsive records within the electronic records systems searched"); *Wiesner v. FBI*, 577 F. Supp. 2d 450, 458 (D.D.C. 2008) (rejecting as conclusory an agency submission that "declare[d] that a search using any of [the requested] terms would fail").

Courts also have rejected an agency's use of a single search term when there were other reasonable search terms not used and the agency did not explain why it omitted such terms. *Asarco, Inc. v. EPA*, No. 08–1332, 2009 WL 1138830, at *2 (D.D.C. Apr. 28, 2009) (ordering new search using additional key words to remedy inadequate search which used only one search term); *Heffernan v. Azar*, 2018 WL 3150214, at *12 (D.D.C. June 27, 2018) ("second-guess[ing]" agency component's use of a single search term, despite identifying some responsive records, when the agency failed to explain why additional search terms used by other agency components would not lead to additional responsive documents).

In addition, it is unreasonable for an agency to refuse to modify its search parameters after documents found through its initial searches suggest that additional responsive records not identified by the original search terms exist.  Although it need not search for every record referenced in the released documents, the agency must establish that it conducted a reasonable, good-faith search for the cross-referenced documents identified.  *Coffey v. Bureau of Land Management*, 277 F. Supp. 3d 1, 7 (D.D.C. 2017).  To do so, it must show that it (1) produced

10

those documents; (2) was unable to locate those documents; (3) withheld those documents under an applicable FOIA exemption; or (4) determined that those documents were unresponsive to the FOIA request, liberally construed. *Id.*; *see also Meyer v. BOP*, 940 F. Supp. 9, 14 (D.D.C. 1996) (finding agency declaration inadequate because it did not explain why documents referenced in responsive pages in agency memorandum were not released); *Katzman v. Freeh*, 926 F. Supp. 316, 320 (E.D.N.Y. 1996) (denying summary judgment "until defendant releases these documents [referenced in released documents] or demonstrates that they either are exempt from disclosure or cannot be located").

Here, the Agency performed two searches for documents responsive to the White Paper FOIA, both of which were inadequate. In the first search, Deputy Director Turk personally searched on his private/personal non-government email accounts and the Agency provided no details about what methods he used, nor did it explain why it did not release the documents referenced in the documents Turk located. *See* Chisholm Decl. ¶ 6; *see also* SUMF ¶ 24. In the second search, the ATF's Office of Science and Technology limited its search to the email files of only 13 individuals using the single search term "white paper". *See* Chisolm Decl. ¶ 7-8; *see also* SUMF ¶¶ 21-22. The inadequacies of each search are addressed in turn.

**A.**     **The Agency Has Failed to Show that Allowing Mr. Turk's Undirected Self-Collection of Some Responsive Records Resulted in an Adequate Search**

The first search was fatally flawed from the beginning because the Agency provided no direction or oversight whatsoever. Deputy Director Turk performed his own undocumented search of politically significant emails made using his personal/non-government email address. *See* SUMF ¶¶ 23-24. As e-discovery expert Judge Scheindlin explained, an agency cannot trust a custodian to conduct unsupervised searches because document search is a learned skill that most do not possess. *National Day Laborer Organizing Network v. U.S. Immigration & Customs Enforcement*, 877 F. Supp. 2d 87, 108-09 (S.D.N.Y. 2012) ("[M]ost custodians cannot

11

be 'trusted' to run effective searches because designing legally sufficient electronic searches in the . . . FOIA context[] is not part of their daily responsibilities.").  And here, there is no indication that Turk possesses such experience.

Furthermore, Mr. Turk's unguided and undocumented search is not an abstract concern. On the contrary, his limited search failed to identify a potentially significant email correspondence where Turk forwarded a draft version of the White Paper to a gun industry lobbyist.  *See* Ex. E to Lee Decl. (p. 921), Jan. 9, 2017 email from R. Turk to Mark Barnes attaching "White Paper Turk final draft 1.2017.docx."  While the Agency released this missing email as part of an email string, the Agency did not release it as a stand-alone record and, more important, did not release the attached draft White Paper.  This omission is significant because the Agency never released the attachment despite its clear responsiveness.

Indeed, the Agency cannot satisfy the Agency's burden to show that the search was adequate, because the Agency did not identify (and appears to be unaware of) the search terms or other methods used by Deputy Director Turk during his self-collection efforts, and did not follow up on missing documents referenced in the responsive materials.  *See Aguirre v. SEC*, 551 F. Supp. 2d 33, 61 (D.D.C. 2008) (describing agency's declaration as inadequate because declaration failed to provide search terms or methods used); *Defs. of Wildlife v. U.S. Border Patrol*, 623 F. Supp. 2d 83, 92 (D.D.C. 2009) (rejecting a declaration that "simply states that searches were conducted" without providing search terms).

In its search declaration, the Agency merely stated that Acting Deputy Director Turk "also undertook a search of his private/personal non-government email accounts to provide a number of documents to the team charged with facilitating a response to the [House Oversight] Committee."  Chisholm Decl. ¶ 6.  It did not state whether he also reviewed his hard copy files or other electronic files and it did not describe what, if any, search terms he used.  *See generally*

12

Chisholm Decl. It also appears to have provided no direction or oversight to Mr. Turk. *Id.* This justification is inadequate.

Courts have found similar declarations to be insufficient to meet an agency's burden when they did not state the search terms used or detail the search process. *See, e.g., Parker v. ICE*, 238 F. Supp. 3d 89, 104 (D.D.C. 2017) (holding that agency failed to meet its burden because its declaration "provided insufficient detail" about the search terms and the "nature of that electronic search process"); *Tushnet v. ICE*, 246 F. Supp. 3d 422, 434–35 (D.D.C. 2017) (finding that agency declaration stating that offices had "full discretion to search their records" was inadequate).

As a result, the Court should order the ATF to conduct a proper search of former Deputy Director Turk's records, no matter where the Agency has allowed those records to be stored.[4]

**B.    The Agency Has Failed to Show that the Use of a Single Search Term on a Select Number of Custodians Constitutes an Adequate Search**

The ATF's electronic search of its employees' emails was inadequate for at least three reasons: (1) it did not explain why it used only one search term, *see* SUMF ¶ 20; (2) it not did justify the decision to exclude known recipients of the White Paper from the search, *see id.* ¶¶ 21-22; and (3) it failed to state why it limited its search to email files, *see id.* ¶ 20.[5]  These

---

[4]    The Agency has suggested that it cannot conduct a new search of Deputy Director Turk's personal/non-government email for responsive records because he is no longer employed by the Agency. This argument is meritless. *See, e.g., Judicial Watch, Inc. v. Kerry*, 844 F.3d 952, 956 (D.C. Cir. 2016) (holding that agency did not fulfill its obligations under FRA by taking only some efforts to recover Sec. Clinton's email). In fact, not only can the Agency take such steps, it is required by law to ensure that it has captured all government records. *See* 44 U.S.C. § 3106(a)-(b).

[5]    Instead of showing that its search was reasonable, as required by case law, the Agency mainly relies on its certification to Congress that the Agency has "taken reasonably diligent efforts to seek the documents and information requested" as proof that its search were adequate. *See* Def. Mot. at 12; *see also* Chisholm Decl. ¶¶ 4, 9. But, like a conclusory and generalized search declaration submitted to the court under penalty of perjury, this certification cannot meet the Agency's burden of *showing* that it conducted an adequate search. *See Am. Ctr. for Equitable Treatment, Inc. v. Office of Mgmt. & Budget*, 281 F. Supp. 3d 144, 152 (D.D.C. 2017).

failures each render the Agency's search declaration inadequate and require a supplemental search to correct these flaws.

First, the Agency erred by using a single search term. *See Asarco, Inc. v. EPA*, No. 08–1332, 2009 WL 1138830, at *2 (D.D.C. Apr. 28, 2009) (ordering new search using additional key words to remedy inadequate search which used only one search term). While the ATF claims that the term "White Paper," was the broadest possible search term, it does not explain why it limited itself to a single search term. *See* Chisholm Decl. ¶ 7. And, although it not a requirement that an agency use more than one search term, it must have a reasonable basis for limiting its search -- otherwise it causes courts to second guess whether the use of other search terms would lead to additional responsive documents. *See Heffernan v. Azar*, 2018 WL 3150214, at *12 (D.D.C. June 27, 2018).

Yet, here, the Agency provides no explanation why it omitted obvious additional search terms. For example, it would be reasonable for the Agency to use different variations of the document's title; other key words or phrases from the White Paper Request; or the names of known-third-party organizations that received copies of the document:

- the full title of the document ("Federal Firearm Regulations - Options to Reduce or Modify Firearms Regulations")

- the title used in earlier drafts ("Guns in America -- Options for a New Administration: Secure 2nd Amendments Rights, support for the firearms industry and the Violent Gun Crime Fight"); or

- other synonyms for "white paper" (such as "position paper" or "WP").

- "National Rifle Association," or NRA;

- the names of gun manufacturers;

- members of the Presidential Transition Team;

- "National Shooting Sports Foundation" or NSSF;

- NRA's Institute for Legislative Action; or

14

- Mark Barnes.

The Agency also fails to explain the criteria used to restrict the number of custodians. Although it claimed to want the broadest possible search, *see* Chisholm Decl. ¶ 5, the Agency limited its search to 13 custodians -- a fraction of the total number of individuals who received the White Paper. Based on the records released to date, the White Paper was distributed to another nine named individuals[6], three intra-agency listservs[7], and about 88 redacted recipients. Thus, the Agency should have searched each of these individuals' files or, at least, explained why the excluded custodians were unlikely to have responsive documents. *See Bigwood*, 132 F. Supp. 3d at 140 (D.D.C. 2015); *see also Heffernan v. Azar*, 2018 WL 3150214, at *12 (D.D.C. June 27, 2018).

In addition, the Agency limited its search to email records and made no effort to locate other electronic documents or hard copy records despite the White Paper Request specifically asking for such documents. *See* ECF No. 1, Ex. A at 2 (Oct. 16, 2017) ("All other documents, including drafts related to the January 20, 2017 White Paper titled "Federal Firearm Regulations - Options to Reduce or Modify Firearms Regulations."). At a minimum, the Agency must explain truncating the search. This failure alone renders the Agency's search inadequate. *Pulliam v. EPA*, 235 F. Supp. 3d 179, 188-89 (D.D.C. 2017) (finding that search was inadequate because it limited the search to email only despite clear instructions in the request to search other types of documents).

---

[6]    John J. Durastanti; Delano A. Reid; Greg P. Czarnopys; Megan A. Bennett; Curtis W. Gilbert; William P. McMullan; Peter Forcelli; Joel J. Roessner; and Daniel L. Board, Jr.

[7]    All Assistant Directors; All Deputy Assistant Directors; and Intergovernmental Affairs.

Thus, the Court should order the Agency to conduct a supplemental search of all known custodians, using expanded search terms and encompassing both hard copy and non-email electronic files.

## II.    The Agency Failed to Justify Its Withholding of Records Responsive to the White Paper Request

### A.    The Agency Has Failed to Meet its Burden That It Properly Redacted Records Under the Deliberative Process Privilege

The Agency withheld numerous pages based on Exemption (b)(5) as protected by the deliberative process privilege, including comments on the White Paper itself (*see* Vaughn Index at Doc. Nos. 331, 332) and select lines from the Agency's response to the House Oversight and Government Reform committee (*see* Vaughn Index at Doc. Nos. 280, 289, 290, 291, 293, 294, 297, 299, 301). Yet it did not justify those withholdings with the particularity required by the FOIA, relying instead on generic statements paraphrasing the applicable standards.

The deliberative process privilege "protects agency documents that are both predecisional and deliberative." *Judicial Watch, Inc. v. Food & Drug Admin.*, 449 F.3d 141, 151 (D.C. Cir. 2006). A document is predecisional if "it was generated before the adoption of an agency policy" and deliberative if "it reflects the give-and-take of the consultative process." *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 860 (D.C. Cir. 1980). This privilege therefore protects only statements or documents that have been a direct part of the deliberative process in that it makes recommendations or expresses opinions on legal or policy matters. *See Cobell v. Norton*, 213 F.R.D. 1, 5 (D.D.C. 2003).

To properly claim a FOIA exemption based on deliberative process privilege, the *Vaughn* index must provide detailed information about the agency's decision making process to enable a fair determination of the agency's claims. *See Chesapeake Bay Foundation, Inc. v. U.S. Army Corps of Engineers*, 722 F. Supp. 2d 66, 75 (D.D.C. 2010). The description should specify the

deliberative process under which documents are redacted as well as show the harm that will result from release. *Hall v. Dep't of Justice,* 552 F. Supp. 2d 23, 29 (D.D.C. 2008); *see also Judicial Watch, Inc. v. U.S. Postal Service,* 297 F. Supp. 2d 252, 259 (D.D.C. 2004) (holding that agency must "pinpoint an agency decision or policy to which the document contributed or identify a decision-making process to which a document contributed."); *National Resources Defense Council v. Dep't of Defense*, 388 F. Supp. 2d 1086, 1103-04 (C.D. Cal. 2005) ("It is not enough to say that the documents relate, in some way to [agency actions], for if they did not, the documents would not be before the court at all.").

The FOIA Improvement Act of 2016 created a heightened standard for withholding records based on deliberative process, requiring agencies to articulate a specific reason that the release of a document will harm the deliberative process. 5 U.S.C. § 552(a)(8)(A)(i)(I). *See also Ecological Rights Foundation v. Federal Emergency Management Agency*, 16-cv-0524, 2017 WL 5972702, at *6 (N.D. Cal. Nov. 30, 2017). According to the accompanying Senate Committee Report, the new standard requires agencies to make "a determination . . . as to whether the agency reasonably foresees that disclosing that particular document, given its age, content, and character, would harm an interest protected by the applicable exemption." Senate Report 114-4. It also cautioned that "mere 'speculative or abstract fears,' or fear of embarrassment, are an insufficient basis for withholding information." Senate Report 114-4.

Here, the Agency's descriptions fail to describe the decision or policy to which the document contributed and, more significantly, make no attempt to explain how the harm contemplated by the deliberative process privilege would be implicated by the unique circumstances surrounding the White Paper.

For example, the Agency justified withholding portions of two early drafts of the White Paper. It used the same explanation for both records, stating that "[t]hese documents present a

specific point in the strategy process" and that the "ATF needs to be able to internally review and discuss proposed analysis and recommendations prior to making final Agency decisions." Ex. F to the Lee Decl., Vaughn Index at Doc. 331; Vaughn Index as Doc. 332. These concerns are generic and un-particularized. It does not describe the strategy process to which the documents contribute. And the explanations ignore the unique circumstances posed by the White Paper.

Specifically, the document purports to be the individual views of Mr. Turk -- a position conveyed to Mr. Allen before he provided comments, confirmed by Mr. Turk in his sworn testimony before Congress, and the Agency asserted the "individual view" position in its official statements to the press. There cannot be a deliberative process privilege when the document is not part of the agency decision making process. And it is absurd to treat this outlier of a document as a routine correspondence soliciting the opinions of a subordinate.

The Agency's justifications for redacting versions of its letter to the House Oversight Committee are similarly infirm. It again repeated the exact same justification used for other types of deliberative process privilege documents, thus failing to provide the particularized explanation mandated by statute. *Compare* Ex. F to Lee Decl., Vaughn Index Nos. 280, 289, 290 (justifying withholding portions of congressional letters) *with* Vaughn Index Nos. 331, 332 (justifying withholding portions of white paper). These generic explanations make it impossible to determine the decision-making process at issue or the factual or non-factual nature of the redactions.

Thus, these descriptions do not pass muster under the traditional standard and fall far short of the particularized standard mandated by the FOIA Improvement Act. As a result, the Agency must release the redacted portions.

> **B.    The Agency Has Failed to Justify its Withholding of Responsive Records as "Out of Scope"**

The Agency also redacted portions of responsive records because those portions were purportedly out-of-scope, although it is unclear what the Agency's basis is for defining records to exclude some attachments and exhibits. Although the Agency withheld these records, it has not even tried to show that these redactions were proper as it did not raise this issue at all in its Motion for Summary Judgment. *Steinberg v. Dep't of Justice*, 23 F.3d 548, 551 (D.C. Cir. 1994); 5 U.S.C. § 552(a)(4)(B) ("the burden is on the agency to sustain its action"). And, in fact, the Agency cannot meet that burden because these portions of documents were not properly withheld.

The D.C. Circuit has stated that "[n]on-responsive redactions . . . find no home in FOIA's scheme." *American Immigration Lawyers Association v. EOIR*, 830 F.3d 667, 677 (D.C. Cir. 2016). Instead of redacting, "once an agency identifies a record it deems responsive to a FOIA request, the statute compels disclosure of the responsive record—i.e., as a unit—except insofar as the agency may redact information falling within a statutory exemption." *Id.* at 677. Shortly after the D.C. Circuit issued its *EOIR* opinion, the Department of Justice's Office of Information Policy released guidance on defining a record. *See* Dep't of Justice, Office of Information Policy, "OIP Guidance: Defining a 'Record' Under the FOIA," (Updated Feb. 15, 2017) (available at https://www.justice.gov/oip/oip-guidance/defining_a_record_under_the_foia). The guidance also suggested the primary question an agency faces is, "What exactly is the requester seeking?" *Id.*

Applying *EOIR* and the Department of Justice's own later guidance, the Agency should have turned to the request itself to determine whether the redacted portions constituted the same or different records. *Id.* at 678. Here, the Brady Center's White Paper request specifically asked for all exhibits and attachments to documents or communications about Acting Deputy Director Turk's position paper. ECF No 1, Ex. A at 3 (Oct. 16, 2017) ("Responsive documents are

requested to be produced in their entirety, including all attachments, enclosures, and exhibits.").

So the Agency has no basis to exclude exhibits or attachments to responsive records as outside

the scope of the request.[8]

Thus, the Court should require the Agency to release all non-exempt portions of records

withheld on the basis the records were "out of scope."

## III.   The Agency Failed to Justify Its Redaction of Records Responsive to the Warning Letter Request (Jan. 30, 2018; Mar. 9, 2018; Apr. 9, 2018 Productions)

The Agency wrongly claims its Warning Letter redactions are proper because the

information is exempt from release under FOIA Exemption (b)(3) pursuant to provisions of the

Tiahrt Amendment.  *See* Agency SUMF ¶ 9.  The Tiahrt Amendment (named after sponsoring

Representative Todd Tiahrt) restricts ATF from expending appropriated funds to disclose certain

materials contained within the Firearms Trace System database.  It was first attached to an

appropriations bill in 2003 and has been included in several appropriations bills since, most

recently in 2012.  *See generally* Angelina Jacqueline Tang, Taking Aim at Tiahrt, 50 WM. &

MARY L. REV. 1787, 1807-18 (2009).  The original Tiahrt Amendment explicitly prohibited

the expenditure of appropriated funds for ATF's disclosure of gun trace information under a

FOIA request.  *See* Pub. L. No. 108-7 § 644 (2003).  Amendments in later versions of the Tiahrt

Amendment have opened some categories of information to public release, as explained below.

---

[8]     Even if the White Paper Request somehow did not encompass these withheld exhibits or attachments, the Agency's determination would still be improper.  *See Coffey v. Bureau of Land Management*, 277 F. Supp. 3d 1, 7 (D.D.C. 2017) ("To the extent the agency intends to argue that the attachments should be treated as separate "records" from the emails to which they were attached, the Court rejects this approach."); *Parker v. United States Dep't of Justice, Office of Prof'l Responsibility*, 278 F. Supp. 3d 446, 451–52 (D.D.C. Aug. 16, 2017) (concluding that a draft attachment and the letter to which it was attached should reasonably be treated as a single "record" for purposes of FOIA where the letter "itself touche[d] on the subject matter of the attachment and refer[red] the recipient to examine its contents").

Here, the Agency has adopted an expansive interpretation of the Tiahrt Amendment to redact, among other information, the numbers of record-keeping and other violations committed by FFLs.  As detailed below, the Agency's position that the Tiahrt Amendment applies to this information has no support in the plain language of the law or any cases addressing it.  It also ignores the Tiahrt Amendment's exception for statistical aggregate information.  Even more fundamentally, the Agency's efforts to withhold this information fail because it has not met its burden to justify its actions -- and in fact, has failed to provide a *Vaughn* index at all.

### A.    The Agency Failed to Meet Its Burden Because It Has Not Provided a Vaughn Index

Frustratingly, the Agency has moved for summary judgment in this FOIA dispute without providing the Court with sufficient basis to assess the application of Exemption 3.  Specifically, the Agency has failed to produce a *Vaughn* index to accompany the redacted documents.  As this court held in *Citizens for Responsibility & Ethics in Washington v. U.S. Dep't of Justice*, 955 F. Supp. 2d 4, 13 (D.D.C. 2013), "[w]hile FOIA's individual exemptions impose their own tailored evidentiary burden, as a starting point, the government must meet five overarching requirements for each withholding."  To meet its burden for withholding documents, the government must

> (1) [I]dentify the document, by type and location in the body of documents requested; (2) note that [a particular exemption] is claimed; (3) describe the document withheld or any redacted portion thereof, disclosing as much information as possible without thwarting the exemption's purpose; (4) explain how this material falls within one or more of the categories ...; and [if the exemption requires a showing of harm] (5) explain how disclosure of the material in question would cause the requisite degree of harm.

*Id.* (quoting *King*, 830 F.2d at 224).  The Agency has failed to satisfy its burden here by failing to produce a *Vaughn* index.

Moreover, when considering the specific requirements for withholding information under Exemption 3, the court evaluates whether the statute is a nondisclosure statute and the records in

questions fall within the applicable statute's scope. *See CIA v. Sims*, 471 U.S. 159, 167 (1985); *see also Nat'l Sec. Counselors v. CIA*, 960 F. Supp. 2d 101, 175 (D.D.C. 2013). Resolving the applicability question is a fact-specific inquiry that requires analysis of the statutory language and then application of that statutory interpretation to the information sought to be withheld. The Agency argues that the Tiahrt Amendment precludes disclosure of the redacted information under two separate provisions. *See* Agency Mot. at 6-9. First, the Agency argues that the redacted information constitutes "information required to be kept by licensees pursuant to section 923(g) of title 18, United States Code, or required to be reported pursuant to paragraphs (3) and (7) of such section…" *See id.* at 8 (quoting Pub. L. 112-55, 125 Stat. 552). Section 923(g) of title 18 identifies specific types of records that FFLs must maintain. *See* 18 U.S.C. § 932(g)(3)(A). Second, the Agency argues in a single conclusory sentence that it "also withheld certain information obtained from the Firearms Trace System database." *See* Agency Mot. at 9.

These conclusory assertions are inadequate. The Agency has failed to satisfy its burden of demonstrating that the withheld information falls under the disclosure prohibition of the Tiahrt Amendment because the Agency has provided insufficient information to assess the nature of the redacted information and the applicable disclosure prohibition. The Kil Declaration asserts what categories of information are protected from disclosure under the Tiahrt Amendment, *see* Kil Decl. (ECF No. 16-2) ¶¶ 14-20, without providing any specifics on how those categories relate to the specific redactions applied by the Agency. But, to date, the only information provided by the Agency to assess the appropriateness of the redactions are the documents themselves, which are generally redacted with the marking of "(b)(3) - Public Law 112-55." *See, e.g.,* Ex. C to Lee Decl. at 3, 6.

Essentially, the Agency is asking Plaintiff and the Court to take a leap of faith and trust it, claiming that certain information is not disclosable under Exemption 3 without specifying

which aspect of the disclosure statute covers which portions of the redactions.  While a *Vaughn*

Index is not necessarily required to resolve every FOIA dispute and other means can be

employed, "[t]his flexibility . . . is layered on a background presumption going back several

decades that document-by-document explanations of withheld information are required."

*Citizens for Responsibility & Ethics in Washington*, 955 F. Supp. 2d at 14.  The Agency has

failed to provide that explanation here, and so its motion for summary judgment should be

denied.

### B.    The Withheld Information Does Not Fall Within the Tiahrt Amendment

#### 1.    Scope of Information Prohibited From Disclosure Under the Tiahrt Amendment

The Agency repeatedly redacted information from ATF Form 5700.14 (Assignment and

Report) or ATF E-Form 5030 5 (Report of Violation) that shows the total <u>number</u> of times the

ATF identified certain violations for particular gun dealers.  *See, e.g.*, Exs. C-D to Lee Decl.,

Excerpts from January 30 and March 9, 2018 Productions.  It justified these redactions by

claiming they were prohibited by the Tiahrt Amendment, and thus Exemption (b)(3).  *See*

Agency Mot. at 6-9.  The ATF, however, is wrong – the Tiahrt Amendment does not prohibit the

release of the number-of-violation information in these reports.

The Tiahrt Amendment prohibits the ATF from using appropriated funds to disclose "the

contents of the [eTrace database] or any information required to be kept by licensees pursuant to

[18 U.S.C. § 923(g)] . . ."  Pub. L. 112-55, 125 Stat. 552.  The Agency interprets this language to

apply expansively to include not only the information required to be maintained by § 923(g), but

information *derived* from those mandated reports.  *See* Agency Mot. at 8 ("The information

withheld here consists of "portions of Firearms Inspection Reports *derived* directly from

'information required to be kept by licensees pursuant to [18 U.S.C. § 923(g).")") (emphasis

added).  The Agency offers no support for this vastly overbroad interpretation, and there is none.

Instead, the Agency devotes much of its discussion of Exemption 3 to 18 U.S.C. § 923(g), and notably the passage of the Tiahrt Amendment, which states that "no funds appropriated under this or any other Act may be used to disclose . . . any information required to be kept by licensees pursuant to section 923(g) of title 18, United States Code." *Id.* at 8.  Section 923(g) requires FFLs to maintain certain records.  *See* 18 U.S.C. § 923(g).  Although the Agency cites no case law interpreting the record-keeping requirements of § 923(g), the Agency lists eight specific forms or other types of documents required to be maintained under this statute.  *See* Kil Decl. ¶ 6.  And notably, the Agency does not list either ATF Form 5700.14 (Assignment and Report) or ATF E-Form 5030 5 (Report of Violation), the two forms the Agency repeatedly redacted in this case.  Thus, the Agency failed to show its redactions fall under the Tiahrt Amendment's disclosure prohibition.

The Agency also tries to justify its broad reading of the Tiahrt restrictions by citing three cases purportedly standing for a general principle not at issue here:  that transaction information from the eTrace system is exempt from FOIA.  *See Reep v. United States Dep't of Justice*, 302 F. Supp. 3d 174, 183 (D.D.C. 2018) ("The Court finds that ATF properly withheld the weapon's trace summary under this exemption."); *Abdeljabbar v. Bureau of Alcohol, Tobacco & Firearms*, 74 F. Supp. 3d 158, 173 (D.D.C. 2014) ("[T]he ATF asserts that it properly withheld the trace information concerning a co-conspirator pursuant to Exemption (b)(3)…"); *Fowlkes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 139 F. Supp. 3d 287, 291 (D.D.C. 2015) (seeking a specific firearm trace report).  None of these cases apply here because the Warning Letter FOIA does not seek eTrace information for any firearm or any purchaser.[9]

---

[9]    Although, due to the Agency's failure to provide a *Vaughn* index, the Agency does not identify the (b)(3) redactions based on the Tiahrt Amendment's Section 923(g) language as opposed to those made based on the eTrace prohibition.  *See supra* Section III(A).

The Agency provides no support for its broad reading because no such support exists. While some courts have opined that ATF cannot release the forms gun dealers are required to keep pursuant to section 923(g)[10], no court has gone so far as to exempt from disclosure any information contained on other forms, where ever else it may appear in the ATF's records. There is thus no precedent for the Agency's position.

Here, as a matter of first impression, this Court must determine the boundaries of the Tiahrt Amendment's Section 923(g) prong as it relates to gun dealer inspection reports.  In analyzing the scope of FOIA exemptions, courts construe the statutory exemptions, including Exemption 3, narrowly, with doubts resolved in favor of disclosure . *See Dep't of Air Force v. Rose*, 425 U.S. 352, 361 (1976).  There is a "strong presumption in favor of disclosure." *U.S. Dep't of State v. Ray*, 502 U.S. 164, 173 (1991).  This "general philosophy of full agency disclosure [applies] unless information is exempted under clearly delineated statutory language." *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 151-52 (1989) (recognizing the "specific exemptions from disclosure set forth in the Act," but noting that "these exemptions must be narrowly construed.") (internal quotation marks and citation omitted).

Applying this fundamental principle of FOIA law, the Court needs to look no further than the plain language of the Tiahrt Amendment to determine its scope.  Therefore, assuming *arguendo* the Tiahrt Amendment's validity, any prohibition on ATF using appropriated funds to disclose information should be narrowly read and limited to (a) the contents of the eTrace database and (b) information required to be kept by licensees pursuant to 18 U.S.C. §923(g).

---

[10]    *See, e.g., Caruso v. U.S. Bureau of Alcohol, Tobacco & Firearms*, 495 F. App'x 776, 778 (9th Cir. 2012) ("Here, Caruso seeks copies of the acquisition and disposition books . . . federal firearms forms . . .  and gunsmith books detailing weapons submitted, traded, or exchanged for repairs . . . These items are required to be kept by a federal firearms licensee . . . [t]he Appropriations Act explicitly bars the ATF from disclosing any information required to be kept by licensees under this section.").

2.    **The Warning Letter FOIA Does Not Seek Information Covered By Tiahrt**

The Warning Letter FOIA seeks ATF inspection reports which show the findings of firearm dealer inspections aggregated to the dealer level.  To the Brady Center's knowledge, none of the documents produced and redacted by the Agency contain information on specific firearms traces, or are records required by 18 U.S.C. § 923(g) to be retained by gun dealers. Instead, the Agency has largely redacted portions of the ATF Report of Violations and ATF Assignment and Report forms.  *See e.g.* Ex. C to Lee Decl., Jan. 30, 2018 Production Excerpt. What the redacted documents show is that, rather than seeking to withhold the documents protected by § 923(g), the Agency is redacting the total number of instances in which the gun dealers failed to properly maintain records and/or commit other violations, including but not limited to:[11]

- "Failure to obtain and/or furnish all information required in each ATF Form 4473…") (*Id.* at 6);

- "Failure to obtain a properly completed ATF Form 4473, Section A…" (*Id.* at 7);

- "Failure to comply with the requirements of Sec.478.102 [sic] and record on the ATF Form 4473 the date on which the licensee contacted NICS…" (*Id.* at 8.);

- "Failure to timely or accurately record the receipt and/or disposition of a firearms [sic] . . .") (Ex. D to Lee Decl., Mar. 9, 2018 Production Excerpt at 2)

- "Instances where a firearm was transferred with no acquisitions or dispositions on the A&D record.") (*Id.* at 4);

- Firearms found that were initially reported as lost (*Id.* at 70)

- "Failure to obtain a properly completed ATF Form 4473 from a nonlicensee prior to the transfer of a firearm" (*Id.* at 136)

---

[11]    The Agency also redacted non-violation related information under the guise of the Tiahrt Amendment.  For example, it redacted the number of firearms acquired/disposed in a calendar year pursuant to (b)(3).  *See* Ex. D to Lee Decl., Mar. 9, 2018 Production Excerpt at 80.

- "Fail[ure] to conduct NICS check prior to the transfer REDACTED firearm to an unknown man" (*Id.* at 150)

- Number of firearms "manufactured into Short Barrel Rifles" (*Id.* at 296)

- Number of machine guns in FFL's possession (*Id.* at 367)

- Number of times a licensee failed to file a Report of Multiple Sales with the ATF and how many firearms were involved in those transfers (Ex. C to Lee Decl. at 10-11, 31)

In other words, these Exemption 3 redactions are not protecting the underlying ATF forms required by § 923(g) or any of the transaction-specific information that may be in those ATF forms.[12]  The Warning Letter FOIA request is not seeking (and the redactions do not protect) any of the information required to be maintained by § 923(g).  The only information that would be revealed is the aggregate number of times that a gun dealer failed to properly maintain its records or committed other violations.  This information falls outside of § 932(g), outside of the Tiahrt Amendment, and outside of FOIA Exemption 3.

The Agency's explanation for why the number of instances that a gun dealer failed to properly maintain records should be redacted is circular and conclusory.  The Agency argues that it only had three options:  (1) redact number of recordkeeping violations and the nature of violations; (2) release the number of violations but redact the nature of the violations; or (3) redact the number of violations but release the nature of the violations.  *See* Agency Mot. at 8-9.[13]  The Agency then portrays itself as reasonable (magnanimous, even) for at least not redacting the nature of the violations.  There is no logic supporting this false menu of options

---

[12]      Due to the Agency's failure to provide a *Vaughn* index, the Brady Center does not have visibility into why certain redactions are marked for both Exemption 3 and Exemption 6 (personal privacy interests).  The application of Exemption 6 is not before the Court, and the Brady Center has not objected to the Agency's reliance on Exemption 6 to withhold personally identifiable information.

[13]      The Agency does not cite any formal policy or regulation supporting its position, presumably because no such policy or regulation exists.  *See generally* Kil Decl.

available to the Agency.  The Agency can release both pieces of information, as neither the

aggregate number of violations nor the nature of the violations is protected under the Tiahrt

Amendment.

The Agency concedes this fact by releasing some of this information derived from the

records required by § 923(g), in this case, the nature of the violations.  As seen in cases applying

Tiahrt to eTrace data, the prohibition does not allow exercise of agency discretion in withholding

of information.  *See Reep*, 302 F. Supp. 3d at 183; *Abdeljabbar*, 74 F. Supp. 3d at 173; *Fowlkes*,

139 F. Supp. 3d at 291.  Thus, by permitting some pieces of derived information, there is no

logical reason to exclude other derived information.  The Tiahrt Amendment includes no such

demarcation.

Finally, the Agency notes in passing that "ATF also withheld certain information

obtained from the eTrace database, *id.* at ¶ 20, which has been repeatedly protected from

disclosure by the courts."  *Id.* at 9.  But, the Agency fails to identify which redactions were

allegedly made because of the eTrace prohibition or even what is meant by the vague statement

that information was "obtained from" the database.  Again, the Warning Letter FOIA does not

seek eTrace information, and there is no evidence that any of the information redacted is eTrace

information.  The redactions are focused on the numbers of violations at the dealer level, and no

information on specific gun traces (including information on the firearms or the private parties

involved) would be released here.

        3.      **The Redacted Information Is Statistically Aggregated and Hence Not Prohibited From Disclosure by Tiahrt.**

Even if the Court determines that the redacted information is eTrace data (which the

FOIA request does not seek) or otherwise prohibited from disclosure by the Tiahrt Amendment,

the Agency can release the redacted violation totals under the Tiahrt Amendment's "statistical

aggregate data" exemption.  In 2009, the Tiahrt Amendment was modified to include a carve-out

28

from its restrictions on the release of gun trace data for certain "statistical aggregate data," a carve-out that remains in the most recently passed version of the Tiahrt Amendment, which reads in relevant part:

> [D]uring the current fiscal year and in each fiscal year thereafter, no funds appropriated under this or any other Act may be used to disclose part or all of the contents of the Firearms Trace System Database maintained by [ATF] . . . ***except that this proviso shall not be construed to prevent*** . . . the publication of annual statistical reports on products regulated by [ATF], including total production, importation, and exportation . . . , or ***statistical aggregate data regarding firearms traffickers and trafficking channels, or firearms misuse, felons, and trafficking investigations***[.]

Pub. L. 112-55, 125 Stat. 552, 609-610 (2011) (emphases added).  *See also* Kil Decl. ¶ 16.

Although the statute and related cases do not define "statistical aggregate data," the plain meaning of these terms makes the definition clear.  Meriam Webster defines "statistical" as "of, relating to, based on, or employing the principles of statistics"[14] and defines "aggregate" as "taking all units as a whole."[15]  Together, the words encompass any statistical aggregating function performed on a given set of data.  And the total number of occurrences of an event in a data set is a type of statistical aggregate data.

The Tiahrt Amendment's statistical aggregation carve-out clarifies that the statute is intended to protect trace information that relates to specific transactions (including specific firearms and purchasers) but is not intended to preclude the release of statistically aggregated information.  Tiahrt's statistical aggregation carve-out was recently addressed by the U.S. District Court for the Northern District of California in *The Center for Investigative Reporting v. United States*, C.A. No. 3:17-cv-06557-JSC, Dkt. No. 39 (July 10, 2018).  The court held that

---

14    "Statistical," Merriam-Webster Dictionary (2018), available at https://www.merriam-webster.com/dictionary/statistical

15    "Aggregate," Merriam-Webster Dictionary (2018), available at https://www.merriam-webster.com/dictionary/aggregate

although ATF could not be compelled to produce new documents that do not exist, "the Tiahrt Amendment does not prohibit the publication of *existing* statistical aggregate data." *Id.* at 14 (emphasis original). In its ruling, the court noted that "[p]laintiff cites to ATF's disclosure of statistical aggregate data in [prior Administrative Procedures Act] cases—and ATF's invocation of Tiahrt Amendment exception (C) as justification for such disclosure…" *Id.*

Unlike in *The Center for Investigative Reporting*, the Agency is not required by the Warning Letter FOIA to create any new documents. Instead, the Agency must simply remove the redactions on the redacted documents (including Report of Violations and Assignment and Report forms) showing the total number of violations. As a result, even if the Court determines that the information withheld pursuant to Exemption 3 is eTrace data (or other information covered by § 923(g)), the withheld information should still be released because it is statistically aggregated and removes all of the specific firearm/purchase information from the underlying trace reports, and is thus permitted to be released under the Tiahrt Amendment.

## <u>CONCLUSION</u>

For these reasons, Plaintiff requests that the Court deny Defendants' motion for summary judgment and grant Plaintiff's motion for partial summary judgment. Specifically, Plaintiff requests that the Court (i) order Defendants to remedy its inadequate search in response to the White Paper FOIA, (ii) deny Defendants' Exemption 5 and out-of-scope claims on materials responsive to the White Paper FOIA, and (iii) deny Defendants' Exemption 3 claims with respect to the Warning Letter FOIA.

September 10, 2018                                        Respectfully Submitted,

/s/ Kevin T. Barnett
Kevin T. Barnett (D.C. Bar No. 1003410)
Alan Pemberton (D.C. Bar No. 367108)
Nooree Lee (D.C. Bar No. 1001687)
Covington & Burling LLP
One CityCenter
850 Tenth Street NW
Washington, DC 20001
(202) 662-5430
kbarnett@cov.com

Jonathan E. Lowy (D.C. Bar No. 418654)
Joshua Scharff (D.C. Bar No. 999392)
Brady Center to Prevent Gun Violence
840 First Street NE Suite 400
Washington, DC 20002
(202) 370-8106
jlowy@bradymail.org
*Attorneys for Plaintiff*