**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

THE BRADY CENTER TO PREVENT GUN
VIOLENCE,

        Plaintiff

vs.

U.S. DEPARTMENT OF JUSTICE

and

BUREAU OF ALCOHOL, TOBACCO,
FIREARMS AND EXPLOSIVES,

        Defendants.

Case No.  1:17-cv-02130 (RDM)

## MEMORANDUM OF LAW IN REPLY TO DEFENDANT'S OPPOSITION TO PLAINTIFF'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT

Kevin T. Barnett (D.C. Bar No. 1003410)
Alan Pemberton (D.C. Bar No. 367108)
Nooree Lee (D.C. Bar No. 1001687)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street NW
Washington, DC 20001
(202) 662-5430
kbarnett@cov.com

Jonathan E. Lowy (D.C. Bar No. 418654)
Joshua Scharff (D.C. Bar No. 999392)
BRADY CENTER TO PREVENT GUN VIOLENCE
840 First Street NE Suite 400
Washington, DC 20002
(202) 370-8106
jscharff@bradymail.org

*Attorneys for Plaintiff Brady Center to Prevent Gun
Violence*

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ......................................................................................................................... 1

I.    The Agency Failed to Meet Its Burden to Show that Its White Paper FOIA Request Searches
      Were Adequate. ................................................................................................................... 3

      A.    Mr. Turk's Current Status as a Former Employee Does Not Relieve the Agency of Its
            Burden to Show It Conducted a Reasonable Search ............................................... 3

      B.    The Agency Has Failed to Show that Its Search of Other Agency Records was
            Reasonable as to Method and Scope ..................................................................... 7

      C.    The Agency Cannot Establish the Reasonableness of Its Search by Terming Brady's
            Challenges Results-Oriented ................................................................................ 10

II.   The Agency Fails to Show that the Tiahrt Amendment Requires it to Redact Certain
      Information. ...................................................................................................................... 11

      A.    The Agency's *Vaughn* Declaration Does Not Provide Sufficient Basis to Assess
            Application of Exemption 3 .................................................................................. 11

      B.    The Agency's Rationale for Withholding the Number of Violations is Illogical and
            Unsupported ........................................................................................................ 16

      C.    The Redactions Include Counts of Specific Inspection Findings (such as the Number of
            Violations) that are Statistical Aggregate Information Made Disclosable by the Tiahrt
            Amendment .......................................................................................................... 21

III.  The Agency Misconstrues the Scope of the Request ....................................................... 23

CONCLUSION……………….. ................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Fed'n of Gov't Emps., Local 812 v. Broad. Bd. of Governors,*
    711 F. Supp. 2d 139 (D.D.C. 2010) ............................................................. 9

*Am. Immigration Lawyers Ass'n v. EOIR,*
    830 F.3d 667 (D.C. Cir. 2016) ................................................................. 25

*Bigwood v. U.S. Dep't of Def.,*
    132 F. Supp. 3d 124, 144 (D.D.C. 2015) ................................................. 10, 11

*Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of Justice,*
    955 F. Supp. 2d 4 (D.D.C. 2013) ............................................................ 14, 16

*Competitive Ent. Insti. v. Office of Sci. & Tech. Policy,*
    827 F.3d 145 (D.C. Cir. 2016) ................................................................. 7

*Ctr. for Investigative Reporting v. U.S. Dep't of Justice,*
    2018 WL 3368884 (N.D. Cal. July 10, 2018) ........................................... 21, 22

*Darnbrough v. U.S. Dep't of State,*
    924 F. Supp. 2d 213 (D.D.C. 2013) .......................................................... 21

*In re Espy,*
    80 F.3d 501 (D.C. Cir. 1996) ................................................................... 22

*Gawker Media, LLC v. U.S. Dep't of State,*
    266 F. Supp. 3d 152, 158-160 (D.D.C. 2017) .......................................... 6, 7

*Heffernan v. Azar,*
    2018 WL 3150214 (D.D.C. June 27, 2018) .............................................. 8

*Hunton & Williams LLP v. U.S. EPA,*
    248 F. Supp. 3d 220, 237-38 (D.D.C. 2017) ............................................ 3

*Iturralde v. Comptroller of Currency,*
    315 F.3d 311 (D.C. Cir. 2003) ................................................................. 10, 11

*Judicial Watch, Inc. v. Kerry,*
    844 F.3d 952 (D.C. Cir. 2016) ................................................................. 6

*Katzman v. Freeh,*
    926 F. Supp. 316 (E.D.N.Y. 1996) .......................................................... 4

*Keys v. Dep't of Justice,*
    830 F.2d 337 (D.C. Cir. 1987) ................................................................. 16

*Kissinger v. Reporters Comm. for Freedom of the Press*,
  445 U.S. 136 (1980) ................................................................................ 7

*Meyer v. BOP*,
  940 F. Supp. 9 (D.D.C. 1996) ................................................................ 4

*Nat'l Ass'n of Home Builders v. Norton*,
  309 F.3d 26 (D.C. Cir. 2002) ........................................................... 20, 23

*Nat'l Day Laborer Org. Network v. U.S. Immigration & Customs Enf't*,
  877 F. Supp. 2d 87 (S.D.N.Y. 2012) ...................................................... 4

*Nation Magazine v. Customs Serv.*,
  71 F.3d 885 (D.C. Cir. 1995) ................................................................ 10

*Oglesby v. U.S. Dep't of the Army*,
  920 F.2d 57 (D.C. Cir. 1990) .............................................................. 3, 9

*Ortiz v. United States*,
  67 F. Supp. 3d 109 (D.D.C. 2014) .................................................... 20, 21

*Pulliam v. EPA*,
  235 F. Supp. 3d 179, 188-89 (D.D.C. 2017) ........................................ 8, 9

*Shapiro v. CIA*,
  247 F. Supp. 3d 57 (D.D.C. 2017) ................................................... 24, 25

*Shapiro v. U.S. Dep't of Justice*,
  153 F. Supp. 3d 253, 257 (D.D.C. 2016) .......................................... 17, 21

*United States v. Garcia*,
  718 F.2d 1528 (11th Cir. 1983) ............................................................ 22

*Valencia-Lucena v. Coast Guard*,
  180 F.3d 321 (D.C. Cir. 1999) ............................................................ 3, 7

*Weisberg v. Dep't of Justice*,
  705 F.2d 1344 (D.C. Cir. 1983) ........................................................... 20

**Statutes**

18 U.S.C. § 923(g) ..................................................................... *passim*

31 U.S.C. § 5319 ................................................................................ 20

44 U.S.C. § 3106(a)(b) ......................................................................... 6

Banking Secrecy Act ..................................................................... 20, 21

Federal Records Act, 44 U.S.C. § 3105(1) ........................................... 6

Freedom of Information Act, 5 U.S.C. §552 .................................. *passim*

Tiahrt Amendment, Pub. L. 112-55, 125 Stat. 552, 609-10 (2011) ...................................................... 21, 22

**INTRODUCTION**

Plaintiff's Cross-Motion for Summary Judgment (Dkt. No. 17-2) ("Plaintiff's MSJ") showed that the Bureau of Alcohol, Tobacco, Firearms & Explosives ("ATF" or the "Agency") had responded inadequately to two Freedom of Information Act ("FOIA") requests. Plaintiff's first request sought records related to a policy memorandum about potential gun policy shifts authored by then Acting Deputy Director Ronald Turk (the "White Paper Request"). The second request sought records related to inspections of federally licensed gun dealers (the "Warning Letter Request").

As the Agency tells it, it has conducted an exhaustive search for documents responsive to Plaintiff's first request and released as much information as required in response to Plaintiff's second request. But the record tells another story: that the Agency responded to its FOIA obligations based on what was expedient and convenient – and with a clear preference for non-disclosure – rather than what was required by the FOIA statute and case law.

In response to the White Paper Request, the Agency admits that it did not provide any oversight or guidance to then-employee Mr. Turk in his search for agency records on his home computer and reveals that it took no steps to correct glaring deficiencies in that search. The Agency also concedes that in its other search for documents, it truncated its search, using a single search term on a mere fraction of known recipients of the White Paper while ignoring non-email records. All the while, the Agency never tries to explain why the search as constructed could have reasonably been expected to find responsive documents of the type that the Brady Center showed it had missed.[1]

---

[1]    In response to the Brady Center's arguments that its justifications for deliberative process privilege were insufficiently conclusory, the Agency withdrew its more aggressive claims, Agency Opp. at 33, and *finally* provided an explanation for its withholding of draft

The Agency weaves a similar justification for its heavily redacted response to the Warning Letter Request.  Rather than link each of its redactions to a justification for withholding that particular information (as is the function of a *Vaughn* index), the Agency offers broad, conclusory assertions that it must withhold the redacted information.  This cannot carry its burden.  Furthermore, to the extent the Brady Center is able to determine the type of information redacted, the Agency's justification makes no sense and is unsupported by the law.  The Agency redacts the number of violations and the number of firearms involved in those violations as information derived from the required forms.  But it leaves unredacted the nature of violations and some answers provided on those forms.  It defies logic to contend that the nature of the violation is not derived from the forms, but that a count of those same violations is so derived.  And even more puzzling, the Agency defies the plain language of the statute to posit that the Tiahrt Amendment's statistical data exception applies to statistical aggregate data only if such data are captured in ATF's annual reports — thus causing one exception to swallow the other.  When its position is unpacked, it becomes clear that the Agency has provided no adequate basis for its broad (b)(3) redactions.

Given FOIA's strong preference in favor of disclosure and the Agency's widespread failure to meet its burdens, the Court should order the Agency to remedy its inadequate search and release all information improperly withheld.

---

Congressional statements as part of the 2d Chisholm Declaration.  Despite this being the Agency's third opportunity to provide this information (informally before briefing and as part of its own summary judgment motion), the Agency has finally met its burden or at least come sufficiently close that the Brady Center is withdrawing its claim for the draft Congressional statement materials responsive to the White Paper Request withheld on the basis deliberative process privilege.

## ARGUMENT

I.     **The Agency Failed to Meet Its Burden to Show that Its White Paper FOIA Request Searches Were Adequate.**

The Agency makes no attempt to show it conducted a reasonable search of agency records in Mr. Turk's personal email, admits that it failed to search non-email records, and ignores the many deficiencies in its production caused by its use of a single underinclusive search term.  Instead, it tries to excuse its inadequate efforts by claiming that a full search of agency records would have been too hard and that now a full search of agency records still in Mr. Turk's possession would be impossible.  As detailed below, these excuses cannot meet the Agency's burden to "demonstrate beyond material doubt that its search was 'reasonably calculated to uncover <u>all</u> relevant documents.'"  *Valencia-Lucena v. Coast Guard*, 180 F.3d 321, 325 (D.C. Cir. 1999) (quoting *Truitt v. Dep't of State*, 897 F.2d 540, 542 (D.C. Cir. 1990) (emphasis added)).

A.     **Mr. Turk's Current Status as a Former Employee Does Not Relieve the Agency of Its Burden to Show It Conducted a Reasonable Search**

The Agency essentially argues that the Court should accept as adequate Mr. Turk's search for agency records in his personal email, even though the Agency knows nothing about that search.  Instead, it says "there is no reason to believe that Mr. Turk did not perform an adequate search of his private, non-ATF email account."  Agency Opp. at 5.  But this turns the standard upside down—it is the Agency that must prove it made "a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested." *Oglesby v. U.S. Dep't of the Army*, 920 F.2d 57, 68 (D.C. Cir. 1990); *see also Hunton & Williams LLP v. U.S. EPA*, 248 F. Supp. 3d 220, 237-38 (D.D.C. 2017) (reviewing and affirming agency's search of personal email accounts based on a detailed declaration laying out the method of that search).  It is not the Brady Center that must show that

3

Mr. Turk's search was inadequate, especially when the Agency has told us nothing about that search.

Furthermore, despite the Agency's conclusory statements otherwise, the Brady Center did identify at least two serious reasons to question the adequacy of Mr. Turk's search for agency records. First, the Brady Center pointed out that Mr. Turk has no training in searching for electronic records, and the ATF has provided no information that anyone at ATF aided his search or provided that training. *Nat'l Day Laborer Org. Network v. U.S. Immigration & Customs Enf't*, 877 F. Supp. 2d 87, 108-09 (S.D.N.Y. 2012) ("[M]ost custodians cannot be 'trusted' to run effective searches because designing legally sufficient electronic searches in the . . . FOIA context[] is not part of their daily responsibilities."). Second, it showed that Mr. Turk had failed to identify a key communication—sent from the personal email account that he supposedly searched—in which Mr. Turk sent for review by a gun industry lobbyist, Mark Barnes, a draft of his White Paper. *See* Barnett Decl., Ex. A, Jan. 9, 2017 email from R. Turk to Mark Barnes (attaching "White Paper Turk final draft 1.2017.docx"). To establish the reasonableness of the search, the Agency must at least explain why a reasonable search could have missed this known responsive record. *See Meyer v. BOP*, 940 F. Supp. 9, 14 (D.D.C. 1996) (finding agency declaration inadequate because it did not explain why agency did not release apparently responsive documents referenced in pages in agency memorandum that had been released to the requester); *Katzman v. Freeh*, 926 F. Supp. 316, 320 (E.D.N.Y. 1996) (denying summary judgment "until defendant releases these documents [referenced in released documents] or demonstrates that they either are exempt from disclosure or cannot be located").

Rather than explain how it addressed these issues, the Agency insists that there is nothing more that could have been done to locate agency records in Mr. Turk's possession and harps on

the fact that Mr. Turk is now a former employee.  Agency Opp. at 7-10.  This argument is both factually misleading and legally incorrect.

The Agency elides the fact that Mr. Turk was an active employee of the ATF (and one of its senior-most officials) during all relevant time periods at issue.  In fact, because he did not retire until the end of February 2018[2], he was an ATF employee:

- in March 2017 when the Brady Center submitted its White Paper request (Kil Decl. ¶ 3);

- in April 2017 when the ATF asserts it conducted searches for responsive records (Chisholm Decl. ¶¶ 7-8);

- in April 2017 through October 2017 when the ATF ignored the Brady Center's repeated inquires about the status of the White Paper Request (*see* ECF No. 7, Answer (Dec. 1, 2017), ¶¶ 16, 18, 20, 21, 22, 23, 24, 25);

- in October 2017 when the Brady Center filed this lawsuit (ECF No. 1, Complaint (Oct. 16, 2017); *see also* Kil Decl. ¶ 5);

- in November 2017, when the Agency's Answer was due (*see* ECF No. 5, Agency Mot. for Ext. (Nov. 27, 2017));

- in December 2017 when the Agency appeared before this Court stating that it needed more time to process the records it identified in April (*see* Minute Order dated Dec. 21, 2017);

- in January 2018 when the Brady Center first started raising questions about the adequacy of the search conducted for White Paper documents; and

- in early February 2018 when the Agency finally released its first 1134 pages of records responsive to the White Paper Request (Kil Decl. ¶ 6).

---

[2]   Upon information and belief, Mr. Turk retired sometime in late February 2018.  *See* General Officer Management Office, <u>Biography, Brigadier General Ronald B. Turk</u>, National Guard Bureau, http://www.nationalguard.mil/portals/31/Features/ngbgomo/bio/2/2830.html (last visited Nov. 18, 2018) (stating that Mr. Turk "[r]etired in February 2018 after serving over 28 1/2 years as an ATF Special Agent."); Ronald Turk, LinkedIn, https://www.linkedin.com/in/ronald-turk-1139674a/ (last visited Nov. 11, 2018) (LinkedIn profile showing Mr. Turk as retiring from his position at ATF in February 2018).

Thus, the Agency should not be heard to claim now that it was powerless to supervise, direct or inquire into Mr. Turk's search methods, and his now-retired status should in no way excuse the Agency's failure to fulfill its statutory obligations.

In addition, the Agency's position is legally incorrect. Whether this is a Federal Records Act proceeding or not, the Agency must prevent the unlawful removal or destruction of federal records. *See* Federal Records Act, 44 U.S.C. § 3105(1) ("FRA"). Under the FRA, if the relevant agency head learns of any unlawful removal or destruction, he or she "shall notify the Archivist ... and with the assistance of the Archivist shall initiate action through the Attorney General for the recovery of [those] records." 44 U.S.C. § 3106(a).[3] Such an action requires no request by a member of the public; it is a duty of the agency head. This obligation extends to email communications created or received through non-government email accounts such as Gmail or Yahoo. *See, e.g.*, *Judicial Watch, Inc. v. Kerry*, 844 F.3d 952, 956 (D.C. Cir. 2016) (holding that agency did not fulfill its obligations under the FRA by taking only some efforts to recover former Sec. Clinton's emails). It does not matter that this is not a FRA action— the Agency has a clear obligation to obtain the personal emails of Mr. Turk, and the FRA outlines how the Agency can go about getting those agency records.

Finally, the Agency relies on a single district court case involving a FOIA discovery issue to disclaim any responsibility for searching agency records on Mr. Turk's personal email. *See* Agency Opp. at 8-10 (citing *Gawker Media, LLC v. U.S. Dep't of State*, 266 F. Supp. 3d 152, 158-160 (D.D.C. 2017)). Reliance on the *Gawker* case is misplaced. It involved a completely

---

[3]   The FRA further provides that if the agency head fails to "initiate an action for such recovery or other redress within a reasonable period of time," "the Archivist shall request the Attorney General to initiate such an action" and must notify Congress of that request. *Id.* § 3106(b). It does not appear that the Agency has done any of this here.

different question from the one presented here:  *Gawker* did not resolve an agency's obligation to show it conducted an adequate search, but rejected the FOIA requester's motion for third-party discovery (of the former employee) before summary judgment.  Since courts even disfavor ordinary opposing party discovery in FOIA litigation, it is hardly significant that a court refused to permit third-party discovery, and *Gawker* is thus inapposite.

Even more problematic for the Agency's position is the D.C. Circuit's rejection of the argument that documents on a nongovernmental email system are beyond the scope of FOIA. *Competitive Ent. Insti. v. Office of Sci. & Tech. Policy*, 827 F.3d 145, 149-50 (D.C. Cir. 2016). There, the court recognized that "if a department head can deprive the citizens of their right to know what his department is up to by the simple expedient of maintaining his departmental emails on an account in another domain, [the purpose of FOIA] is hardly served." *Id.* at 150. And while the official in *Competitive Enterprise* was a current government employee at the time of the litigation, the courts that have considered similar questions have said the issue turns on either the employee's status when the FOIA request was filed, *see Kissinger v. Reporters Comm. for Freedom of the Press*, 445 U.S. 136, 155 n.9 (1980), or when the agency undertakes to process the request, *see Gawker*, 266 F. Supp. 3d at 155 n.3.  Under either test, Mr. Turk was a current employee of ATF at the relevant time, and so the records were within the Agency's possession.  The Agency thus bears the burden of showing that it conducted an adequate search for agency records in Mr. Turk's possession, and must produce any such responsive records.

### B.    The Agency Has Failed to Show that Its Search of Other Agency Records was Reasonable as to Method and Scope

The Agency concedes facts that establish that its search was not "reasonably calculated to uncover all relevant documents." *Valencia-Lucena*, 180 F.3d at 325 (internal quotation omitted). It admits that it restricted the search to omit both electronic documents and hard copy documents

and also limited the number of custodians.  *See* 2d Chisholm Decl. ¶ 3 ("The search was limited

to thirteen custodians"); *id.* ¶ 5 ("Plaintiff is correct in that the only file system searched was

email records.").  These admissions alone render the Agency's search inadequate.  *See Pulliam v.*

*EPA*, 235 F. Supp. 3d 179, 188-89 (D.D.C. 2017) (finding search inadequate because it limited

the search to email-only despite instructions in the request to search other types of documents).

Further, the Agency fails to address head-on why the single search term it used would

likely capture all relevant documents, especially given the many gaps identified by the Brady

Center.  Instead, the Agency offers conclusory statements that prove only that the single search

term used—"white paper" —would capture some responsive records.  *See* Agency Opp. at 11.

The Agency's explanation, however, does not address how its one chosen search term would

capture relevant communications with the NRA, gun manufacturers, the National Shooting

Sports Foundation, gun lobbyist Mark Barnes, or members of the Presidential Transition Team—

all documents specifically requested.  Similarly, the use of the single term "white paper" could

not reasonably be expected to find the earliest documents related to the conception, composition,

and drafting of the document that eventually became known as the "White Paper." But such early

documents are at the core of the Brady Center's interest.  As courts have recognized, failing to

address proposed additional search terms renders a search inadequate.  *See Heffernan v. Azar*,

2018 WL 3150214, at *12 (D.D.C. June 27, 2018) ("second guess[ing]" agency component's use

of a single search term that found some responsive records, when the agency failed to explain

why additional search terms used by other agency components would not lead to additional

responsive documents).

Equally unreasonable is the Agency's conclusory explanation for refusing to search non-

email electronic files and hard copy documents.  *See Oglesby*, 920 F.3d at 68  (holding that an

agency "cannot limit its search to only one record system if there are others that are likely to turn up the information requested").  It cannot reasonably claim that searching non-email electronic documents would not turn up any non-duplicative records when at the same time the Agency argues that it cannot produce the MS Word file attached to one of Mr. Turk's personal emails. Here, a reasonable search requires looking for electronic or hard copy documents.  *See Am. Fed'n of Gov't Emps., Local 812 v. Broad. Bd. of Governors*, 711 F. Supp. 2d 139, 153 (D.D.C. 2010) ("The agency's determination that it was worthwhile to search those individuals' digital files was reason enough to suggest that their paper files might also contain responsive documents," and thus finding digital-only search inadequate); *Pulliam*, 235 F. Supp. 3d at 188-89 (finding search inadequate because it limited the search to email-only despite clear instructions in the request to search other types of documents).

In addition, rather than justify the clear shortcomings in its arbitrary curtailment of its search to the 13 initial recipients of the White Paper, the Agency erects a strawman, stating that it could not search the emails of over 5000 ATF employees.  *See* 2d Chisholm Decl. ¶ 4.  The Brady Center has never suggested that a reasonable search required such a broad custodian list. It has instead asked that the Agency expand its custodian search to the fewer than 100 individuals shown in the documents already produced as receiving the White Paper.[4]  Pl. MSJ at 15.  The Agency has not shown why this somewhat broader but manageable search should be found unreasonable.  Instead, the Agency somehow maintains that only the initial recipients

---

[4]  Searching all known recipients was in fact the approach that the Agency at first suggested, as documented in an email released in response to the Request.  *See* ECF No. 17*, Lee Decl., Ex. E, Bennett Email (April 13, 2018) at 870-872.  It is unclear why the Agency opted against this reasonable suggestion.  Rather than offer an explanation, the Agency attacked a strawman of its own creation.  *See* 2d Chisholm Decl. ¶ 5 ("contrary to Plaintiff's understanding it was never ATF's intention to search every custodian.").

generated documents responsive to Brady's White Paper request, and that the distribution of the White Paper itself to subsequent recipients or comments by such recipients could not have generated documents sought by the White Paper Request.  Even to summarize the Agency's position reveals how patently unreasonable it is.

### C.     The Agency Cannot Establish the Reasonableness of Its Search by Terming Brady's Challenges Results-Oriented

The Agency camouflages its failure to conduct and verify a reasonable search detailed above by urging the Court to dismiss the Brady Center's arguments as results oriented.  Agency Opp. at 5-6.  To do so, it relies on cases stating that a search is not unreasonable just because it fails to turn up a specific document.  *Id.*  The Agency's reliance is misplaced.  These cases are irrelevant where, as here, the Agency has not first established that it conducted a reasonable search and has not addressed the deficiencies raised by the requester.  *See* Section I.A-B, *supra*.

In fact, in each case relied on by the Agency for this proposition, the court first reviewed the searches conducted before addressing the imperfect results.  *See Nation Magazine v. Customs Serv.*, 71 F.3d 885 (D.C. Cir. 1995); *Iturralde v. Comptroller of Currency*, 315 F.3d 311, 315 (D.C. Cir. 2003); *Bigwood v. U.S. Dep't of Def.*, 132 F. Supp. 3d 124, 144 (D.D.C. 2015). Contrary to the Agency's suggestion, in *Nation Magazine*, the D.C. Circuit was troubled by the Agency's failure to find at least one known missing document.  *Nation Magazine*, 71 F.3d at 892.  It held that the agency's search efforts were inadequate and ordered the agency to either conduct a new search for the missing document or provide sufficient explanation about why such a search would be unreasonably burdensome.  *Id*.

The cases in which the court did not demand a new search are distinguishable.  In *Iturralde*, the court afforded little weight to "the fact that a records search failed to turn up a particular document" in its adequacy analysis only because the plaintiff did not maintain that the

Agency "failed to search particular . . . files" or otherwise "ignored indications in documents found in its initial search." *Iturralde*, 315 F.3d at 315-16.  Unlike the requester in *Iturralde*, however, the Brady Center maintains both that the ATF failed to search particular files and ignored indications of search inadequacy in documents found during the initial search.

In *Bigwood*, the court found that the Agency's search efforts, which included two rounds of searches using 17 search terms across the paper, electronic, and email files of six subcomponents in addition to targeted searches for the documents the plaintiff complained were missing, were reasonable.  *Bigwood*, 132 F. Supp. 3d at 137-38, 143-44.  Given the agency's herculean search efforts, the court dismissed as conjectural the plaintiff's lingering complaints of missing documents.  *Id.* at 144.  In sharp contrast to *Bigwood*, the Agency here has not conducted nearly the same level of exhaustive search, using one search term on only the email files of just 13 custodians.  Thus, until the Agency meets its initial burden of establishing the reasonableness of its search efforts and addresses the deficiencies identified by the Brady Center, it cannot rely on the safe harbor provided by these cases.

## II.     The Agency Fails to Show that the Tiahrt Amendment Requires it to Redact Certain Information.

### A.      The Agency's *Vaughn* Declaration Does Not Provide Sufficient Basis to Assess Application of Exemption 3.

The Agency's Reply Brief asserts that a *Vaughn* index need not substantiate its redactions to the Warning Letter Request documents, and that the Agency instead met its burden through its *Vaughn* Declaration.  *See* Reply Brief at 21-24.  The Agency's response misses the point.  The Agency bears the burden to justify the application of FOIA exemptions, including Exemption (b)(3), *see* Plaintiff's MSJ at 21-22, and nothing that the Agency has produced provides sufficient information for the Court or Plaintiff to assess whether the Agency has properly

applied Exemption (b)(3).  A *Vaughn* index would have satisfied that burden, and the Agency might have met its burden through other means as well.  But the Agency has not done so here.

The Agency's Reply Brief completely evades the undisputed fact that the Agency asserted two different bases for its Exemption (b)(3) redactions without linking any of its redactions to either basis.  *See* Plaintiff's Mot. at 22.  The Agency first argues in broad conclusory terms that some of the redacted information is "information required to be kept by licensees pursuant to section 923(g) of title 18, United States Code, or required to be reported pursuant to paragraphs (3) and (7) of such section…"  *See* Agency Mot. at 8 (quoting Pub. L. 112-55, 125 Stat. 552).  The Agency then separately asserts, in equally broad and conclusory fashion, that it "also withheld certain information obtained from the Firearms Trace System database."  *See* Agency Mot. at 9.  Neither the redactions themselves nor the Agency's declarations provide the Court with any basis to assess which specific legal basis the Agency claims for each redaction and why.  Plaintiff and the Court are simply left to guess.  So the first problem is that the Agency asserts two bases for redaction but never tells which of those two bases applies to any given redaction, rendering judicial review of its claims impossible.

Even more concerning is the second problem:  The opaque nature of many of the Agency's redactions makes it impossible to determine what type of information was redacted and how that type of information would or would not fall within the categories allegedly required to be withheld by the Tiahrt Amendment.  While in some instances the nature of the redactions is self-evident (such as when the Agency has redacted the number of times a licensee committed a specific type of violation), the Agency also redacted large blocks of text with no explanation other than a generic reference to the Tiahrt Amendment.  Some of these block redactions obscure entire pages or span multiple consecutive pages.  *See, e.g.*, Barnett Decl., Ex. B, Mar. 9, 2018

Prod. at 209-14; *id.*, Ex. C, Apr. 9, 2018 Prod. at 193-203 (redacting 10 consecutive pages).

Others hide entire paragraphs and long passages, as evidenced by the exemplar excerpts below:



Barnett Decl., Ex. C, Apr. 9, 2018 Prod. at 442;

Barnett Decl., Ex. D, Jan. 30, 2018 Prod. at 7.

As can be seen from these exemplar redactions, their context and length completely obscure the nature of the underlying information. The redacted information could be about any number of topics, and Plaintiff and the Court have no way of determining if the information does or does not fall within the categories supposedly precluded from release by the Tiahrt Amendment.

The Agency has no real response and does not suggest how the Court might go about meaningfully reviewing these unexplained redactions. It instead goes on offense, claiming the Brady Center's demand for the Agency to provide a *Vaughn* index is "astounding." Agency Opp. at 22. But what the Brady Center is demanding is simply that the Agency show its work by explaining the nature of the information withheld and why the Agency thinks it falls within Tiahrt's non-disclosure provisions. This is the minimum that FOIA requires. FOIA requirements are not satisfied by the Agency's position here, which boils down to a simple "Trust us, it's Tiahrt." *See* Plaintiff's Mot. at 21-22; *see also Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of Justice*, 955 F. Supp. 2d 4, 13 (D.D.C. 2013). Here, as the Agency notes, the Brady Center pressed for early summary judgment because the redactions "are repetitive and not fact specific" but instead "[t]he ATF redacts the responses to the same blocks of information from the same forms." Agency Opp. at 22. Despite the Agency's attempt to score a debater's point, Brady is not asking for a fact intensive response that ties the Agency's justification to unique information about each inspection report at issue. The Brady Center is simply asking for some explanation for why the Agency redacted each block of information. The Brady Center strongly suspects that the reason the Agency is refusing to show its thought process—how it links specific types of information to the two types of information that it contends are barred by Tiahrt—is because it knows that linking process will not withstand

judicial scrutiny. Once the Court rules on some concrete examples, the future course of similar redactions will be settled. But the Court needs to be provided with some specific examples first.

Producing a *Vaughn* index would have provided the Court and the Plaintiff the information necessary to consider the appropriateness of the redactions. The Agency also could have produced a robust declaration that tied detailed descriptions of the categories of redacted information to specific sections of the redacted ATF forms, explaining how certain fields on the forms were tied to information exempted from release by section 923(g) or derived from the e-Trace database.

The Agency, in fact, now reveals that there exists a "template" that instructs its FOIA personnel how to go about redacting allegedly Tiahrt-covered information. *See* 2d Chisholm Decl. ¶ 14. It appears that this document constitutes exactly the type of link between categories of ATF information and the disclosure-prohibiting provisions of the Tiahrt Amendment. Had the Agency provided this template document and explained how it had been used in preparing the redactions in the Warning Letter productions, this might have facilitated the Brady Center's ability to assess the redactions and the Court's ability to review them. It did not do so.

Instead, the Agency produced a pair of conclusory declarations that do not address the issues raised in Plaintiff's MSJ. The Kil Declaration includes only the legal standard for Exemption (b)(3) (Kil Decl. ¶¶ 14-15), a restatement of the language of the Tiahrt Amendment (*Id.* ¶¶ 16-17), two conclusory statements that Exemption (b)(3) applies (*Id.* ¶¶ 18, 20), and then a single paragraph of alleged categorical description (*Id.* ¶ 19). And the alleged categorical descriptions in Paragraph 19 merely provide the Agency's circular justification why the number of violations on the Firearm Inspection Reports were redacted, but gives no detail linking any particular redaction to a legal rationale. In fact, the Kil Declaration provides no categorical

explanation of the redactions other than noting that some redactions concern the number of violations or how some of the redacted information is pulled from the Firearms Trace System database.  To supplement the inadequate Kil Declaration, the Agency submitted a second Chisholm Declaration.  While the second Chisholm Declaration provides some more detail about the categories of redacted information, it still fails in two critical respects:  (1) it does not explain which redactions are tied to which legal theory, and (2) it does not provide sufficient information on what information is being redacted in block text redactions.

The Agency's argument that a *Vaughn* index is not universally required fails to acknowledge that "it is the function, not the form, of the index that is important" in determining sufficiency.  *Keys v. Dep't of Justice*, 830 F.2d 337, 349 (D.C. Cir. 1987); *see also Citizens for Responsibility & Ethics in Washington*, 955 F. Supp. 2d 4, 14 (D.D.C. 2013).  The Agency's declarations fulfill neither the form nor the function required under FOIA.  The Agency has failed to explain the nature of the redacted information or what aspect of the disclosure statute covers which portions of the redactions, and consequently its motion for summary judgment should be denied.

## B. The Agency's Rationale for Withholding the Number of Violations is Illogical and Unsupported

Despite the Agency's failure to particularize the redactions in a meaningful way, the Brady Center can use the context of some redactions to reveal that the Agency persistently redacted the *number* of times a licensee committed a particular violation and the *number* of firearms involved in the violations while disclosing the *nature* of the violation(s).  As detailed in the Brady Center's Motion, the Agency has no basis to withhold such numbers based on Exemption 3, as this information is neither required to be kept by Section 923(g), nor is it eTrace data, and the Agency's latest unpersuasive justification for withholding this information does not

change that analysis.  The Agency's arguments are an attempt to stretch the bounds of the Tiahrt

Amendment, and the Agency ignores that the breadth of the FOIA exemption under Tiahrt, like

all FOIA exemptions, must be construed narrowly.  *See Shapiro v. U.S. Dep't of Justice*, 153 F.

Supp. 3d 253, 257 (D.D.C. 2016) ("[FOIA] thus mandates that an agency disclose records upon

request, unless they fall within one of nine exemptions. 'These exemptions are 'explicitly made

exclusive' and must be 'narrowly construed.'") (*citing Milner v. Dep't of Navy*, 562 U.S. 562

(2011) (further internal citations omitted)).

First, the Agency's attempts at distinguishing the unredacted *nature* of the violation from

the redacted number of such violations simply do not make sense.  On one hand, it argues that

the nature of the violation is not information required to be kept by section 923(g) because an

"FFL does not document that it has made an error" and that "violations listed are not information

required to be kept by licensees." 2d Chisholm Decl. ¶ 14.  It also explains that agents determine

the nature of the violation by using "information both included in the records required to be

maintained and data not in the [section 923(g)] records." 2d Chisholm Decl. ¶ 14.  So far so

good.  But the Agency falls into illogic when it contends that when its agents *count* the number

of violations (e.g., how many *times* such independent non-Tiahrt judgments have been made),

the agents use "information derived solely from the statutorily required information." *Id.*  This

makes no sense.  A numerical count of disclosable information is itself disclosable information.

Moreover, the explanation provided in the 2d Chisholm Declaration contradicts the

explanation provided in the Kil Declaration.  In the Kil Declaration, the Acting Chief of the

Disclosure Division declared that the ATF considered three options "to be *in compliance* with

the [Tiahrt Amendment] restriction." Kil Decl. ¶ 19 (emphasis added).  These three Tiahrt-

compliant options included an option to "redact just the associated violations, but [release] the

**numbers of times a violation occurred.**" *Id.* (emphasis added).  The ATF rejected this option because the "information would be rather useless" to "receive a list of numbers" without "the associated violation" — not because disclosing the number of violations would violate the law, as the Agency now contends it would.  *Id.*  This by itself shows that the redaction policy applied to the count information is arbitrary.

But after the Brady Center identified these inconsistencies, the Agency concocted its post hoc litigation position that investigators used outside information to determine the violation, but used no outside information to determine how many times that violation occurred.  *See* Chisholm Decl. ¶ 14.  The illogic of this position remains unexplained.

In addition, as further evidence of its logical failures, the Agency applies its confusing policy in an inconsistent and selective manner.  For example, the Agency claims that it redacted the number of violations because the information is information found on the forms required by section 923(g).  But it is unclear how this rationale applies to the number of violations for offenses such as *missing* information on forms or the *failure to report* sale of multiple guns or the number of guns missing — which by definition involve information *not reported*, and thus not included on the required reporting forms.  Barnett Decl., Ex. D,  Jan. 30, 2018 Prod. at 235 ("On [REDACTED] block 21c . . . was blank"); Jan. 30, 2018 Prod. at 248 ("Licensee failed to report within 48 hours the theft or loss [REDACTED] [fi]rearms that were identified as unaccounted for following an internal inventory completed by the licensee in March 2015"); Jan. 30, 2018 Prod. at 303 ("On [REDACTED] Transaction Record the licensee failed to record the type of firearm being transferred"); Barnett Decl., Ex. B, Mar. 9, 2018 Prod. at 261 ("[REDACTED] instances each, Items #24 and #25 were blank"); Mar. 9, 2018 Prod. at 372 ("Failure to obtain the transferee's signature (Section A, Item 16) in [REDACTED] [i]nstance").

It is not credible to claim that information *missing* from forms — or even missing forms themselves — is information required to maintained by section 923(g).

Similarly, under the Agency's purported logic, the Tiahrt Amendment prohibits the release of any information *derived* exclusively from the required forms.  Yet the Agency's response is replete with information taken exclusively from the required forms, such as the exact answers provided on certain forms required by section 923(g).  *See, e.g.*, Barnett Decl., Ex. D, Jan. 30, 2018 Prod. at 250 (revealing that purchaser answered "yes" to 11b, 11c, 11d, 11e, 11f, 11g, 11h, 11j; and 11k); Barnett Decl., Ex. B, Mar. 9, 2018 Prod. at 133-40 (noting that form listed total number of firearms as two instead of three, FFL marked "proceed" instead of "delayed," and purchaser answered "yes" to questions 11f, 11i, and 11k); Mar. 9, 2018 Prod. at 261 ("[REDACTED] instances, Item 11a [on ATF Form 4473] was answered "No," indicating that the purchaser was not the actual transferee of the firearm."); Mar. 9, 2018 Prod. at 461 (stating that purchaser answered "yes" to questions 11c, 11i, 11j, and 11k).  These disclosures confirm that it may release information contained in an inspection report, even if it was derived from a form required by section 923(g).

Second, the Agency tries to justify its inconsistent rationale with a blind appeal to the authority of the aforementioned undisclosed policy template.  *See* Agency Opp. at 29 (citing 2d Chisholm Decl. ¶ 14).  But an Agency cannot rely on an undisclosed policy to justify its withholding.  Instead, the Agency bears the burden to present to the Court a reasonable explanation of why withheld information falls in the exemption at issue.  *Weisberg v. Dep't of Justice*, 705 F.2d 1344, 1351 (D.C. Cir. 1983).  Without attaching the policy document, the Agency's claimed obedience to the document is merely a conclusory statement that cannot overcome FOIA's "strong presumption in favor of disclosure."  *Nat'l Ass'n of Home Builders v.*

*Norton*, 309 F.3d 26, 32 (D.C. Cir. 2002) (quoting *Dep't of State v. Ray*, 502 U.S. 164, 173 (1991)).

Third, the Agency also fails to support its position that Exemption 3 should be read broadly, placing misplaced reliance on the district court's *Ortiz* decision. *See* Agency Opp. at 27-28 (citing *Ortiz v. United States*, 67 F. Supp. 3d 109 (D.D.C. 2014)).  Specifically, the Agency cites *Ortiz* for the proposition that Exemption 3 prohibits the disclosure of information in prohibited sources as well as instances in which that information is copied into other sources. But the case cannot be read so broadly.  The Agency ignores the factual differences between *Ortiz* and this matter, in particular the unique provisions of the Banking Secrecy Act ("BSA")— the Exemption 3 statute at issue in *Ortiz*.

Unlike the Tiahrt Amendment, the BSA explicitly provides that "a report *and records of reports* are exempt from disclosure," 31 U.S.C. § 5319, making it a much broader prohibition that reasonably encompasses documents derived from reports in addition to the banking reports themselves.  In contrast, the Tiahrt Amendment only prohibits the "disclos[ure of] the *contents* of the Firearms Trace System database maintained by the National Trace Center of the Bureau of Alcohol, Tobacco, Firearms and Explosive or any *information* required to be kept by licensees pursuant to section 923(g) of title 18, United States Code." Pub. L. 112-55, 125 Stat. 552, 609 (2011). Notably, it says nothing comparable to the BSA's "records of reports" language.  So while *Ortiz* may have been correct to apply Exemption 3 broadly for records of reports subject to the BSA, it cannot be read to create a general principle that "records of" information required to be withheld must also always be withheld, regardless of the nondisclosure statute.  And given the lack of such "records of" language in the Tiahrt Amendment, the Court should follow the mandate to construe FOIA exemptions narrowly rather than create a new broadening principle of

interpretation.  *See Darnbrough v. U.S. Dep't of State,* 924 F. Supp. 2d 213, 216 (D.D.C. 2013)

("Given the FOIA's broad disclosure policy, the United States Supreme Court has 'consistently

stated that FOIA exemptions are to be narrowly construed.'") (quoting *Wolf v. CIA*, 473 F.3d

370, 374 (D.C. Cir. 2007) (further internal citations omitted)); *see also Shapiro*, 153 F. Supp. 3d

at 257.

C.      **The Redactions Include Counts of Specific Inspection Findings (such as the Number of Violations) that are Statistical Aggregate Information Made Disclosable by the Tiahrt Amendment**

The Agency also misses the point about the Tiahrt Amendment's "statistical aggregate

data" exception.  In its motion, the Brady Center accurately contended that "the Agency can

release the redacted violation totals under the Tiahrt Amendment's "statistical aggregate data"

exemption."  Pl. Mot. at 28-29. Indeed, "statistical aggregate data" is an independent exception

to the Tiahrt Amendment's non-disclosure provisions contained in a specific clause of exemption

(c) of the Amendment.  *See, e.g., Ctr. for Investigative Reporting v. U.S. Dep't of Justice*, 2018

WL 3368884, at *9 (N.D. Cal. July 10, 2018) (recognizing that "Tiahrt Amendment does not

prohibit the publication of existing statistical aggregate data").  The Agency, however, ignores

the plain language of this particular clause and argues that the documents at issue are not "annual

statistical reports," and therefore "none of the information at issue is covered by the Tiahrt

Amendment's exception."  Agency Opp. at 31-32.  This utterly misreads the Tiahrt Amendment.

To reach this conclusion, the Agency inverts the two main clauses of exemption (c), reads them

as one clause, and eliminates most of words in the provision. The Court should reject the

Agency's invitation to read the Tiahrt Amendment in such a conflated manner.

There are **two** distinct exceptions in exemption (c) the Tiahrt Amendment, one for annual

statistical reports and another for statistical aggregate data.  *See, e.g., Center for Investigative

Reporting*, 2018 WL 3368884, at *9.  In its relevant part, the Tiahrt Amendment provides that

"this proviso shall not be construed to prevent . . . the publication of annual statistical reports on

products regulated by [ATF], including total production, importation, and exportation . . . , **or**

statistical aggregate data regarding firearms traffickers and trafficking channels, or firearms

misuse, felons, and trafficking investigations[.]"  Pub. L. 112-55, 125 Stat. 552, 609-10 (2011)

(emphases added); *see also* Kil Decl.¶ 16.  According to canons of statutory construction, the

"or" is disjunctive, which means that it "set[s] out separate and distinct alternatives." *In re Espy*,

80 F.3d 501, 505 (D.C. Cir. 1996) (quotations omitted); *see also United States v. Garcia*, 718

F.2d 1528, 1532-33 (11th Cir. 1983) (noting that "[t]he specific use of the disjunctive 'or' after

the comma demonstrates that Congress intended . . . . alternatives").  Stated differently, by using

the word "or," Congress created two separate exceptions to the Tiahrt Amendment's disclosure

prohibition.

The Agency, however, suggests that these distinct exemptions are one in the same:

"statistical aggregate data" is only exempted if it is contained in ATF "annual statistical reports."

*See* Def. Opp. at 31.  This interpretation is belied by its action in other litigations.  For example,

in previous lawsuits in which gun dealers and firearms trade associations challenged an ATF

reporting requirement, ATF released statistical aggregate information about total number of

firearms as part of an "administrative record" and not as part of an annual statistical report.

Critically, ATF justified this practice on the ground that Subpart C of the Tiahrt Rider authorizes

disclosure of such statistical aggregate data, with no consideration of whether it is contained in

an "annual report."  *See* Barnett Decl., Ex. E, Def.'s Br. in Opp'n to Pl.'s Mot. to Suppl. Admin.

R. at 5, n.2, *Ron Peterson, LLC. v. Jones*, Case No. 11-cv-678 (D.N.M. Mar. 30, 2012) (arguing

that ATF was permitted to disclose the total number of firearms recovered from gun dealers in

administrative record because that information "constitute[d] 'statistical aggregate data . . .,' the

disclosure of which is permitted by statute") (quoting Tiahrt Rider, 125 Stat. at 610); Barnett

Decl., Ex. F (Def.'s Br. in Opp'n to Intervenor Pl.'s Mot. to Suppl. Admin. R. at 5, n.2, *10 Ring*

*Precision, Inc., et al. v. Jones*, No. 11-cv-00663 (W.D. Tex. Mar. 26. 2012)) (same).

      The Agency offers no authorities supporting its novel interpretation, likely because it is

contradicted by the plain language and disjunctive structure of the Tiahrt Amendment itself.  It

also would contravene the Supreme Court's direction to resolve FOIA disputes with a strong

presumption in favor of disclosure.  *Nat'l Ass'n of Home Builders*, 309 F.3d at 32 (quoting *Dep't*

*of State v. Ray*, 502 U.S. 164, 173 (1991)).

      Importantly, the Agency has not disputed the Brady Center's contention that tallies of

inspection findings (such as the number of violations) are such "statistical aggregate data."

Rather, the Agency only argues that these tallies are not included in ATF's "annual statistical

reports," which the Brady Center has never alleged.  Thus, the Court should order the release of

the withheld totals, as the Tiahrt Amendment clearly allows for the disclosure of the "statistical

aggregate data" related to "firearms misuse" that plaintiff seeks — regardless of whether the

information is in annual reports.

## III.     The Agency Misconstrues the Scope of the Request

      The Agency's motion sidesteps the fundamental truth at the heart of the dispute over "out

of scope" redactions:  The Brady Center's Request specifically identifies attachments as

responsive.  ECF No. 1, Ex. A at 3 (Oct. 16, 2017) ("Responsive documents are requested to be

produced in their entirety, including all attachments, enclosures, and exhibits.").  For instance,

the Agency portrays the Brady Center's Request as seeking "access to information concerning

the White Paper, not to information on other topics that had nothing to do with the White Paper."

Agency Opp. Mot. at 17.  That is simply not true.  In fact, the Brady Center request seeks more

than that, specifically seeking any attachments, enclosures, and exhibits to responsive

documents.  In other words, Brady is seeking exactly the type of documents that Agency is now withholding as out of scope.  Attachments are within the scope because Brady's request asks for attachments.  FOIA does not impose a relevance test or a logical contiguousness test, and the Court should not accede to the Agency's attempt to create such tests.

The plain language of the request should be the end of the inquiry, as both the courts and the Department of Justice have recognized.  In *Shapiro v. CIA*, the court identified several criteria to aid agency's efforts to define the scope of a record.  The first three criteria listed by the court were "the requester's intent, maintaining the integrity of the released documents, [and] the scope of the request." *Shapiro v. CIA*, 247 F. Supp. 3d 53, 74-75 (D.D.C. 2017).  Similarly, the Department of Justice's guidance on determining the proper scope of a request states that "[o]ne of the first questions that an agency must answer as it begins to process a Freedom of Information Act request is: 'What exactly is the requester seeking?'"  Dep't of Justice, Office of Information Policy, "OIP Guidance: Defining a 'Record' Under the FOIA," (Updated Feb. 15, 2017) (available at http://www.justice.gov/oip/oip-guidance/defining_a_record_under_the_foia); *see also Am. Immigration Lawyers Ass'n v. EOIR*, 830 F.3d 667, 677 (D.C. Cir. 2016) (citing an earlier version of the DOJ guidance on how to determine the scope of a request).  These authorities confirm the supremacy of the request's own words when determining the proper definition of a record.

The Agency's arguments to the contrary do nothing to change the Request's plain language.  It is irrelevant that the Agency re-reviewed its initial production and re-processed 290 pages improperly withheld as out of scope — dozens of pages remain improperly withheld in their entirety as out of scope.  *See* 2d Chisholm Decl. ¶¶ 9-11.

The Agency's protests that processing these records would be burdensome and time

consuming are similarly irrelevant.  The FOIA provides a remedy for processing burdensome and time consuming requests: extending the response deadlines.  5 U.S.C. § 552(a)(6)(B)(i).  The Agency does not get to craft its own solution because it would be less work.

Moreover, the Agency's reliance on *Shapiro v. CIA* is misplaced.  Agency Opp. at 17 (citing *Shapiro v. CIA*, 247 F. Supp. 3d at 75).  As quoted by the Agency, the *Shapiro* court cautions that an agency's ability to process requests would be hindered "[i]f an agency was forced to turn over a full manual or entire report every time a single page contained a responsive term."  *Id*.  But that is not the present scenario.  Instead, a more apt comparison would be the uncontroversial point that an Agency must process a full manual or entire report every time a requester asks for the full manual or an entire report.  *See, e.g.*, Dep't of Justice, Office of Information Policy, "OIP Guidance: Defining a 'Record' Under the FOIA," (Updated Feb. 15, 2017) (available at https://www.justice.gov/oip/oip-guidance/defining_a_record_under_the_foia) ("For example, the requester might seek a specific report. The agency will search for the requested report and when it locates it, the entirety of the report will be the 'record' that is processed.").  Thus, the Court should require the Agency to release all non-exempt portions of records withheld as "out of scope" because they fall within the terms of Plaintiff's request.

## CONCLUSION

For these reasons, Plaintiff requests that the Court deny Defendant's motion for summary judgment and grant Plaintiff's motion for partial summary judgment.  Specifically, Plaintiff requests that the Court (i) order Defendant to remedy its inadequate search in response to the White Paper FOIA, (ii) order Defendant to release materials responsive to the White Paper FOIA withheld as out-of-scope, and (iii) deny Defendant's Exemption 3 claims about the Warning Letter FOIA.

November 13, 2018

Respectfully Submitted,

/s/ Kevin T. Barnett
Kevin T. Barnett (D.C. Bar No. 1003410)
Alan Pemberton (D.C. Bar No. 367108)
Nooree Lee (D.C. Bar No. 1001687)
Covington & Burling LLP
One CityCenter
850 Tenth Street NW
Washington, DC 20001
(202) 662-5430
kbarnett@cov.com

Jonathan E. Lowy (D.C. Bar No. 418654)
Joshua Scharff (D.C. Bar No. 999392)
Brady Center to Prevent Gun Violence
840 First Street NE Suite 400
Washington, DC 20002
(202) 370-8106
jlowy@bradymail.org
*Attorneys for Plaintiff*

CERTIFICATE OF SERVICE

I hereby certify that on this 13th day of November 2018, a true and correct copy

of the foregoing was served via the Court's electronic filing system on:

      Marina Braswell
      Assistant United States Attorney
      United States Attorney's Office—
      Civil Division 555 4th St., NW
      Washington, DC 20530

                 /s/ Kevin T. Barnett
                 Kevin T. Barnett (D.C. Bar No. 1003410)
                 Covington & Burling LLP
                 One CityCenter
                 850 Tenth Street NW
                 Washington, DC 20001
                 (202) 662-5430
                 kbarnett@cov.com