# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

BRADY CENTER TO PREVENT GUN
VIOLENCE,

*Plaintiff*,

v.

U.S. DEPARTMENT OF JUSTICE, *and*
BUREAU OF ALCOHOL, TOBACCO,
FIREARMS, AND EXPLOSIVES,

*Defendants.*

Civil Action No. 17-2130 (RDM)

## MEMORANDUM OPINION AND ORDER

The Brady Center to Prevent Gun Violence ("Brady Center") brings this Freedom of
Information Act ("FOIA"), 5 U.S.C. § 552, action against the U.S. Department of Justice and one
of its components, the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), seeking
the release of records it claims Defendants have improperly withheld. Dkt. 1 (Compl.). The
Brady Center submitted two FOIA requests to the ATF—one seeking records relating to a paper
written by a senior ATF official about ways to reduce gun regulations ("White Paper Request"),
and the other seeking records relating to ATF inspections of federally-licensed gun dealers
("Warning Letters Request"). Dkt. 1-2; Dkt. 1-3. As required by order of this Court, the ATF
released records responsive to the White Paper Request, but withheld certain records in whole or
in part, and started releasing records responsive to the Warning Letters Request, but with
substantial redactions. Although the ATF's response to the Warning Letters Request is not yet
complete, the Court granted the Brady Center's request for a briefing schedule on (1) the
adequacy of the ATF's response to the White Paper Request, and (2) the lawfulness of the ATF's

redaction of certain information from records responsive to the Warning Letters Request. Minute Order (June 25, 2018).

Consistent with that scheduling order, the parties filed cross-motions for partial summary judgment addressing those issues. Dkt. 16; Dkt. 17. For the reasons explained below, the Court will grant in part and deny in part the parties' respective cross-motions. With respect to the White Paper Request, the Court holds that the ATF did not conduct an adequate search for responsive records; that the ATF lawfully concluded that unrelated attachments to responsive emails were outside the scope of the FOIA request; and that the parties' dispute regarding assertion of the deliberative process privilege has been resolved by the Brady Center's acquiescence in certain withholdings and the ATF's decision to release other previously withheld records. With respect to the Warning Letters Request, the Court holds that the ATF lawfully redacted certain information but that, without a *Vaughn* index or additional information regarding the specifics of each redaction, the Court cannot determine whether each redaction was permissible.

## I. BACKGROUND

The Brady Center submitted the first of the two FOIA requests at issue here on March 29, 2017. Dkt. 1-2. That request—the White Paper Request—sought:

(1) All communications between ATF employees related to the January 20, 2017 White Paper titled "Federal Firearm Regulations—Options to Reduce or Modify Firearms Regulations[;]"

(2) All communications between ATF employees and members of the Presidential Transition Team related to the January 20, 2017 White Paper . . . [;]

(3) All communications between ATF employees and non-government employees, including but not limited to representatives from gun manufacturers or the National Rifle Association, related to the January 20, 2017 White Paper . . . [; and]

(4)     All other documents, including drafts, related to the January 20, 2017
        White Paper . . . .

Dkt 1-2 at 2.  By the time the Brady Center filed suit six months later, the ATF had yet to make a

final determination with respect to the White Paper Request.  Dkt. 1 at 2.

The Brady Center submitted the second of the requests at issue—the Warning Letters

Request—on August 7, 2017.  Dkt. 1-3.  That request sought:

(1)     All warning letters, warning conference notices, and the underlying
        reports of violations and firearms inspection narrative reports, issued to
        federal firearms licensees from July 1, 2015 through June 30, 2017[;
        and]

(2)     All notices of revocation of license and the accompanying ATF Form
        4500s issued to federal firearms licensees from July 1, 2015 through
        June 30, 2017.

Dkt. 1-3 at 2.  As with the White Paper Request, the ATF failed to make a final determination

with respect to the Warning Letters Request by the time the Brady Center brought suit.

At an initial status conference, the ATF explained that it had gathered many—but not

all—of the records responsive to the White Paper Request for the purpose of responding to a

similar request made by the House Committee on Oversight and Government Reform.  Minute

Entry (Dec. 21, 2017).  The Court, accordingly, directed that the ATF promptly release any non-

exempt records that it had already gathered and that the parties file a joint status report

addressing the remaining issues.  The ATF subsequently released 1,134 pages responsive to the

White Paper Request and provided the Brady Center with a *Vaughn* index regarding its

withholdings, and the parties agreed to a briefing schedule to address their remaining differences

regarding the ATF's response to the White Paper Request.  In the meantime, the ATF started to

release records responsive to the Warning Letters Request, albeit with substantial redactions.

Many of those redactions were made pursuant to FOIA Exemption 3 on the ground that the ATF

was precluded from releasing the redacted information by an appropriation's rider, known as the Tiahrt Rider, which precludes the ATF from expending any funds to disclose "any information required to be kept by [federal firearms] licensees pursuant to [18 U.S.C. §] 923(g) . . . or required to be reported [to the ATF] pursuant to paragraphs (3) and (7) of such section." Consolidated and Further Continuing Appropriations Act of 2012, Pub. L. No. 112-55, 125 Stat. 552, 609 (2011).

Against this backdrop, the Brady Center filed a motion requesting that the Court set a briefing schedule to address (1) the adequacy of the ATF's search for records responsive to the White Paper Request; (2) the ATF's decision to withhold attachments to responsive emails as "out of scope" of the FOIA request; (3) the ATF's withholding of records responsive to the White Paper Request based on the deliberative process privilege; and (4) the ATF's redactions of records responsive to the Warning Letters Request based on the Tiahrt Rider. Dkt. 13.

In response, the ATF agreed that the parties should brief the issues relating to the White Paper Request but argued that the Brady Center's request for an opportunity to address the ATF's application of the Tiahrt Rider was premature because the ATF was still processing records responsive to the Warning Letters Request. Dkt. 14 at 2. Following a status conference held to address these and other issues, the Court set a schedule for the parties to file cross-motions for summary judgment addressing (1) all issues posed by the ATF's responses to the White Paper Request, and (2) the application of the Tiahrt Rider to the ATF's responses to the Warning Letters Request. Minute Order (June 25, 2018). The Court held oral argument on the parties' cross-motions for partial summary judgment on September 11, 2019, and the parties subsequently filed supplemental briefs addressing questions posed at oral argument, Dkt. 31; Dkt. 32.

## II. LEGAL STANDARD

To prevail on a motion for summary judgment, the moving party must "show that there is no genuine dispute as to any material fact and . . . [that it] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In a FOIA action, this means that "the agency must demonstrate that it has conducted a 'search reasonably calculated to uncover all relevant documents.'" *Steinberg v. U.S. Dep't of Justice*, 23 F.3d 548, 551 (D.C. Cir. 1994) (quoting *Weisberg v. Dep't of Justice*, 745 F.2d 1476, 1485 (D.C. Cir. 1984)). To make this showing, the agency must provide a "reasonably detailed affidavit, setting forth the search terms and the type of search performed, and averring that all files likely to contain responsive materials (if such records exist) were searched." *Oglesby v. U.S. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990). Agencies may withhold responsive documents uncovered in that search only if those documents fall within one of the exemptions enumerated in 5 U.S.C. § 552(b). Insofar as the agency withholds responsive records pursuant to those exemptions, it must provide an index of that information and the justification that supports withholding each record. *Vaughn v. Rosen*, 484 F.2d 820, 827–28 (D.C. Cir. 1973).

## III. ANALYSIS

The pending cross-motions address all issues posed by the ATF's responses to the White Paper Request and address one, discrete issue posed by the ATF's (not yet complete) responses to the Warning Letters Request. The Court will address each set of issues in turn.

### A. White Paper Request

The Brady Center initially identified three alleged deficiencies in the ATF's responses to the White Paper Request: the adequacy of the ATF's search for responsive records; the ATF's invocation of FOIA Exemption 5 to withhold purportedly deliberative records; and the ATF's

determination that otherwise non-responsive attachments to responsive emails fell outside the scope of the FOIA request. Dkt. 13. The second of these alleged deficiencies is no longer contested, however. The Brady Center has now withdrawn its objection to the ATF's withholding of drafts of materials relating to inquiries from the House Oversight and Government Reform Committee, and the ATF has now released previously withheld drafts of the White Paper. Dkt. 31 at 2; Dkt. 32 at 2. As a result, the ATF is entitled to summary judgment with respect to the agency's assertion of FOIA Exemption 5, with the exception of the Brady Center's challenge to the ATF's withholding of the drafts of the White Paper, which is now moot in light of the ATF's release of the records at issue.

The Court will, accordingly, limit its analysis of the White Paper Request to two issues: the adequacy of the search and the ATF's "out of scope" determination.

    1. *Adequacy of the Search*

The Brady Center lodges two distinct challenges to the adequacy of the search the ATF conducted: the first concerns the adequacy of the search done by the author of the White Paper, former Acting Deputy Director ("ADD") Ronald Turk, of his own personal email for responsive records, and the second concerns the search conducted by the ATF of its electronic and other files. Dkt. 17-2.

        a. <u>Acting Deputy Director Turk's Search of His Personal Email</u>

The Brady Center first argues that the ATF has yet to carry its burden of demonstrating that it conducted an adequate search of ADD Turk's personal email account, which contained agency records responsive to the White Paper Request. *Id.* In FOIA litigation, the agency bears the burden of demonstrating that "it made a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information

requested." *Oglesby*, 920 F.2d at 68. To satisfy this burden, the agency must submit a

declaration that "explain[s] in reasonable detail the scope and method of the search [it]

conducted," *Morley v. CIA*, 508 F.3d 1108, 1121 (D.C. Cir. 2007) (citation and internal quotation

marks omitted), in order to permit "a court to determine if the search was adequate," *Nation*

*Magazine v. U.S. Customs Serv.*, 71 F.3d 885, 890 (D.C. Cir. 1995). The court must deny the

agency's motion for summary judgment "'if a review of the record raises substantial doubt'"

regarding the adequacy of the search. *DiBacco v. U.S. Army*, 795 F.3d 178, 188 (D.C. Cir. 2015)

(citation omitted).

Although ADD Turk is no longer employed by the ATF, he was an ATF employee at the

time the Brady Center submitted the White Paper Request and at the time the ATF conducted its

search for responsive records. Shortly after the Brady Center submitted its FOIA request, the

House of Representatives Committee on Oversight and Government Reform made a similar

request for records from the ATF. Dkt. 22-2 at 1–3 (Second Chisholm Decl. ¶¶ 3–6). Upon

receipt of the congressional request, ADD "Turk informed the [ATF] team responsible for

facilitating the response that he had a limited number of documents on his private/personal non-

government email account." *Id.* at 3 (Second Chisholm Decl. ¶ 6). Because the ATF did not

have access to that account, ADD "Turk was tasked to search" his email for responsive records,

and he "turned over 15 pages of material gathered from his private email account." *Id.* The

ATF, however, does "not know what search terms," if any, ADD "Turk utilized." *Id.* Rather, all

the ATF can say is that "Turk clearly had intimate knowledge of what documents he had created

and were housed on his private email accounts" and that "[t]he search was conducted with the

knowledge that he would have to affirm to Congress that he had taken 'reasonably diligent

efforts to seek the information requested.'" *Id.* (citation omitted).

The Brady Center contends that the ATF has yet to carry its burden of demonstrating that the search of ADD Turk's personal email was complete, and the Court agrees. The ATF does not know what ADD Turk did to attempt to locate responsive records and can only speculate that he must have conducted a complete search. But, absent some information about what ADD Turk did, the Brady Center is deprived of its "opportunity to challenge the adequacy of the search," and the Court is prevented from discharging its responsibility "to determine if the search was adequate." *Oglesby*, 920 F.2d at 68. The Court notes, moreover, that the ATF has not provided a copy of any affirmation that ADD Turk may have provided to Congress regarding the scope and adequacy of his parallel search for records responsive to the congressional request for records.

The Court recognizes that this case poses a hurdle not posed in the garden variety FOIA case because the records at issue were located on ADD Turk's personal email account and because, although he was employed by the ATF at the time the search was conducted, he is no longer an ATF employee. At oral argument, counsel for the ATF conceded that, were the Court to conclude that the ATF had failed to demonstrate that the search of ADD Turk's personal email account was adequate, the Court could "direct the agency to ask Mr. Turk to respond to questions" about what he did. Hrg. Tr. (Rough at 26). The Court will accept that concession for present purposes and will direct the ATF to use its best efforts to determine what ADD Turk did and to file any further evidence it is able to obtain with the Court within thirty days. Should that effort prove inadequate, the Court will determine at that time what, if any, further steps are appropriate.[1]

---

[1] The Court notes, however, that ADD Turk is not a party to this action, and further notes that the Brady Center has not sought to compel the Attorney General or the ATF to retrieve federal records pursuant to the Administrative Procedure Act, 5 U.S.C. § 706(1), and the Federal Records Act, 44 U.S.C. § 3105. *See Judicial Watch, Inc. v. Kerry*, 844 F.3d 952, 954 (D.C. Cir.

b.    The ATF's Search of Agency Files

The Brady Center also contests the adequacy of the remainder of the ATF's search for responsive records, raising three alleged deficiencies.

*First*, the Brady Center challenges the ATF's use of the lone search term "White Paper." Dkt. 17-2 at 19.  According to the ATF, it used that term, and that term alone, because it was "the broadest possible search term[,] as from the beginning the document was referred to as the White Paper both on the document itself, in any known correspondence, and when used colloquially."  Dkt. 16-1 at 3 (Chisholm Decl. ¶ 7).  The Brady Center, in response, argues that the ATF could have—and should have—employed a range of additional search terms, all of which might have reasonably located records that the ATF's search failed to find.  Dkt. 17-2 at 19–20.  Although the Court does not agree that each of the additional terms that the Brady Center proposes is necessary, the Court is convinced that the ATF's search was inadequate.

An "agency need not deploy every conceivable search term or permit the FIOA requester to dictate the search terms in the course of litigation, but it must use terms reasonably calculated to locate responsive records."  *Sai v. TSA*, 315 F. Supp. 3d 218, 241 (D.D.C. 2018).  The "agency fulfills its obligations under FOIA if it can demonstrate beyond material doubt that its search was 'reasonably calculated to uncover all relevant documents.'"  *Valencia–Lucena v. U.S. Coast Guard*, 180 F.3d 321, 325 (D.C. Cir. 1999) (quoting *Truitt v. Dep't of State*, 897 F.2d 540, 542 (D.C. Cir. 1990)).  Here, the ATF's search terms fail that test.

In defense of its use of the single search term "White Paper," the ATF asserts that

(1) those words are on every version of the document created by former ADD Turk, (2) the actual document extension incorporated the words "White Paper," (3) it was consistently circulated and referred to as the "White Paper" within

2016) (recognizing a cause of action under 5 U.S.C. § 706(1) to enforce certain obligations under the Federal Records Act).

> ATF, (4) media coverage and special interest groups, including Plaintiff's organization, referred to the document as the "White Paper," (5) and in communications with ATF, and during subsequent hearings, Congress almost exclusively used the phrase "White [P]aper" when referencing the document.

Dkt. 22-2 at 4 (Second Chisholm Decl. ¶ 8). If all that the Brady Center sought were copies of the White Paper itself, that account would make perfect sense. It makes less sense, however, in light of the fact that the Brady Center sought all communications "*related to* [the White Paper]." Dkt. 1-2 at 2 (emphasis added). It is unlikely that the ATF's search would have located records, for example, reflecting who, if anyone, first encouraged ADD Turk to prepare an evaluation of ways to reduce or modify gun regulations—before the document was created and named the "White Paper." There is reason to believe, moreover, that preliminary communications of this type occurred. Indeed, ADD Turk told Congress that he had "had several conversations over the past year(s) with the [National Shooting Sports Foundation] ["NSSF"], [Mark] Barnes, and others regarding matters discussed in [the] White Paper." Dkt. 17-6 at 4.

Nor would it have been difficult to conduct a more comprehensive search. The ATF, for example, could easily have searched for communications between ADD Turk and the "Presidential Transition Team," *see* Dkt. 1-2 at 2, or between ADD Turk and the NSSF, Barnes, or other likely participants in any communications leading up to the creation of the White Paper. It is not difficult to formulate a variety of possible search terms and to define a relevant timeframe for the search. It is not the Court's role, however, to dictate precisely how the agency should conduct the search. Accordingly, for present purposes, the Court merely holds that the ATF's exclusive use of the search term "White Paper" was not reasonably calculated to locate all records "related to" the white paper. *See Coffey v. Bureau of Land Mgmt.*, 249 F. Supp. 3d 488, 498 (D.D.C. 2017) (search was inadequate where the "search terms by themselves . . . unreasonably limit[ed] the scope of [the] search to communications regarding a single subject . . .

in a manner inconsistent with the request").  The Court will leave it to the ATF, in the first (or,

now, second) instance to craft a search protocol that "can be reasonably expected to produce the

information requested," *Oglesby*, 920 F.2d at 68.[2]

*Second*, the Brady Center contends that ATF improperly limited the set of individuals

whose email accounts it searched to just 13 custodians.  Dkt. 17-2 at 20.  According to the Brady

Center, the White Paper "was distributed to another nine named individuals, three intra-agency

listservs, and about 88 redacted recipients," and the ATF "should have searched each of these

individuals' files or, at least, explained why the excluded custodians were unlikely to have

responsive documents."  *Id.*

The ATF, however, has now explained why it did not search those individuals' email

accounts, and, in the absence of any controverting evidence, the Court is persuaded.  As

explained in a declaration submitted by the Deputy Chief of the ATF's Disclosure Division,

Office of Public and Governmental Affairs:

> Based on conversations directly with the author of the White Paper [ADD Turk]
> it was determined that the thirteen custodians whose emails were pulled and
> searched encompassed the universe of any meaningful communications which
> were not merely downstream sharing.  Once the documents were collected and
> reviewed it was clear that no additional custodian searches were required.

Dkt. 22-2 at 2 (Second Chisholm Decl. ¶ 4).  In other words, the ATF spoke with the key

participant and, based on that conversation, it identified likely custodians of responsive records.

It then collected and reviewed the responsive emails and, based on that review, concluded that

none of the other recipients were likely to have responsive, non-duplicative records.  The Brady

Center, moreover, has now received those same records, and it has not brought to the Court's

---

[2]  To minimize the cost and delay associated with further litigation, the Court encourages the
parties to meet and confer regarding appropriate search terms and an appropriate date range for
further searches.

attention any email suggesting that the ATF missed a further, likely custodian of responsive records. The Court recognizes that the Brady Center may have been at a slight disadvantage because the names of many of the additional recipients have been redacted. But that did not preclude it from flagging email communications at least suggesting that others may possess responsive records—not already found in the electronic files of the thirteen custodians. Under these circumstances, the Court concludes that the ATF has met its "initial burden of demonstrating . . . that it has performed an adequate search," *Hunton & Williams LLP v. EPA*, 248 F. Supp. 3d 220, 237 (D.D.C. 2017), and that the Brady Center has not met its burden of providing some "countervailing evidence" that would put the adequacy of the search "genuinely in issue," *Morley*, 508 F.3d at 1116; *cf. Hunton & Williams LLP*, 248 F. Supp. 3d at 237 ("Mere speculation . . . that private email accounts were used does not require the agency to perform a search.").

*Third*, the Brady Center challenges the adequacy of the search on the ground that the ATF searched only email accounts and did not search any non-email electronic files or any paper records. "It is well-settled that if an agency has reason to know that certain places may contain responsive documents, it is obligated under FOIA to search barring an undue burden." *Valencia-Lucena*, 180 F.3d at 327. An agency "cannot limit its search to only one record system if there are others that are likely to turn up the information requested." *Oglesby*, 920 F.2d at 68.

Here, the ATF has proffered a declaration disclaiming the existence of electronic or paper files other than the email system that it searched. According to ATF, "[a]ll versions and drafts of the White Paper would be located within email communications," and "there were no other electronic . . . or hard copy folders that related to the White Paper" that would merely duplicate what was found in the email of the thirteen identified custodians. Dkt. 22-2 at 2 (Second

Chisholm Decl. ¶ 5).  That declaration is entitled to "a presumption of good faith, which cannot be rebutted by purely speculative claims about the existence and discoverability of other documents."  *SafeCard Servs., Inc. v. Sec. & Exch. Comm'n*, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (internal quotation and citation marks omitted).

The Court, nevertheless, concludes that the scope of the ATF's search was deficient in one respect:  The White Paper was apparently created, and presumably stored, somewhere in the ATF's word processing files, and, as the Brady Center observes, an important, responsive attachment to a produced email was not produced—namely, an early draft of the White Paper that was sent to an industry group.  If, for whatever reason, that document could not be produced by email searches, it was unreasonable for the ATF to stop short of searching ADD Turk's word processing files for the missing draft.  To do so would not have been "unreasonably burdensome," *Nation Magazine*, 71 F.3d at 892 (ordering supplemental search of a separate records system for a particular document where that search would not be "unreasonably burdensome"), and it would have ensured that the ATF's response was complete.  To be sure, an agency has "discretion to confine its inquiry to a central filing system," such as email, but it may do so only if "additional searches are unlikely to produce any marginal return."  *Campbell v. U.S. Dep't of Justice*, 164 F.3d 20, 28 (D.C. Cir. 1998).  In this case, the ATF had reason to believe that at least one record responsive to the Brady Center's request was not found in the email files that it searched but could easily have been located by searching ADD's Turk's word processing files.  Because the ATF did not do so, the Court concludes that the agency's search was inadequate in this respect as well.

2.        *"Out of Scope" Withholdings*

The Brady Center also contends that the ATF improperly withheld portions of responsive records—specifically, certain attachments to responsive emails—on the ground that those portions were "out of scope."  Dkt. 17-2 at 24.  Where an "email included multiple attachments," the ATF "consider[ed] any [attached] document which ha[d] no responsive information as wholly outside the scope."  Dkt. 22-2 at 5 (Second Chisholm Decl. ¶ 10).  The Brady Center challenges that approach, arguing that the ATF had "no basis" for treating the responsive email and withheld attachment as separate records.  Dkt. 17-2 at 20.  Rather, if the email was responsive, in the Brady Center's view, the ATF should have released the email and anything attached to it—regardless of whether the attachment had anything to do with the White Paper.

In pressing this argument, the Brady Center relies on the D.C. Circuit's opinion in *American Immigration Lawyers Ass'n v. EOIR*, 830 F.3d 667, 677 (D.C. Cir. 2016) ("*AILA*"). *AILA*, however, dealt with a different question than the one posed here—that is, "if the government identifies a record as responsive to a FOIA request, can the government nonetheless redact particular information within the responsive record on the basis that the information is non-responsive?"  *Id.*  The answer to that question—"no"—followed from the text and structure of FOIA.  As the Court of Appeals explained:

> The statute . . . sets forth the broad outlines of a process for agencies to follow when responding to FOIA requests: first, identify responsive records; second, identify those responsive records or portions of responsive records that are statutorily exempt from disclosure; and third, if necessary and feasible, redact exempt information from the responsive records. The statute does not provide for withholding responsive but non-exempt records or for redacting nonexempt information within responsive records.

*Id*.  That reasoning, however, does not extend to the question posed here—that is, what constitutes a distinct record for purposes of FOIA?

With respect to that question, the Brady Center cites two decisions from this district, *Coffey v. Bureau of Land Mgmt.*, 277 F. Supp. 3d 1 (D.D.C. 2017) ("*Coffey II*") and *Parker v. U.S. Dep't of Justice*, 278 F. Supp. 3d 446 (D.D.C. 2017), which it contends support the conclusion that the ATF should have treated each email and its attachments as a single record. Dkt. 17-2 at 20 n.8. Both of those cases, however, concerned emails with single attachments the contents of which were directly referenced in the body of the email itself, thus making the email merely fragmentary without the attachment, and both cases expressly declined to adopt a *per se* rule that an email and its attachments must invariably be treated as a single record. *Coffey II*, 277 F. Supp. 3d at 7–8; *Parker*, 278 F. Supp. 3d at 450–52.

The most extensive discussion of how to distinguish between a single record with multiple parts and separate records is found in *Shapiro v. CIA*, 247 F. Supp. 3d 53, 74–75 (D.D.C. 2017). In *Shapiro*, the court upheld the FBI's determination that several large documents covering multiple subjects—such as manuals or comprehensive memoranda—could be treated as separate records. *Id.* The fact that an agency may at times treat document compilations as separate records does not mean, however, an agency may always do so. In the absence of a statutory or judicial definition of "record," the U.S. Department of Justice has offered criteria for agencies to consider when responding to FOIA requests, *see* DOJ, OIP Guidance: Determining the Scope of a FOIA Request, FOIA Update, Vol. XVI, No. 3 (1995), https://www.justice.gov/oip/blog/foia-update-oip-guidance-determining-scope-foia-request. That guidance, summarized in *Shapiro*, advises agencies to consider "the requester's intent, maintaining the integrity of the released documents, the scope of the request, the agency's own knowledge regarding storage and maintenance of documents, efficiency, cost, resource allocation, and maintaining the public's trust in transparency." *Shapiro*, 247 F. Supp. 3d at 74–

75 (citing DOJ, OIP Guidance: Determining the Scope of a FOIA Request, FOIA Update, Vol. XVI, No. 3 (1995)).

The Brady Center contends that these criteria weigh in its favor, and it relies most notably, on the fact the White Paper Request requested the ATF to produce responsive documents "in their entirety, including all attachments, enclosures, and exhibits." Dkt. 17-2 at 19–20 (citing Dkt. 1-2 at 3). Elsewhere, however, the White Paper Request arguably takes a narrower view of what constitutes a distinct record; the request defines a "[d]ocument" to mean, among other things, "all documents *referenced in subject documents* including those noted as exhibits and *attachments* as well as those referenced in the bodies of subject documents or in footnotes to subject documents." *Id.* at 2 (emphasis added). If a "document," by definition, already included all attachments, there would have been no reason to clarify that the term "document" included attachments referenced in the body of the "subject documents." *See id.* But, because FOIA requests are to be construed broadly in favor of the requester, *see Nation*, 71 F.3d at 890, the Court will assume that the White Paper Request unambiguously defined "responsive documents" as including "all attachments"—including those that are not referenced in the main document—and thus that the "requester's intent," *Shapiro*, 247 F. Supp. 3d at 74–75, was that emails and attachments be treated as a single "record."

The requester's intent, however, is but one consideration in this Court's evaluation of whether the agency has properly defined "record" in responding to the White Paper Request, and the remaining considerations weigh heavily against the Brady Center. *See id.* Most notably, the ATF has reviewed each of the attachments and has certified "that none of the separate documents which were considered outside of scope, including certain attachments to emails, contain *any information even slightly related* to the White Paper and, instead, are wholly on independent

16

subjects outside the purview of the underlying request." Dkt. 22-2 at 9 (Second Chisholm Decl. ¶ 13) (emphasis added). Moreover, treating such wholly unrelated attachments as part of the main document would cause increased delay in the agency's responses to FOIA requests, would increase costs to the agency and requesters, and would do little, if anything, to further FOIA's goal of enhancing transparency and confidence in the workings of government. And, absent a reference to the attachment in the body of the main document, which the Brady Center has not brought to the Court's attention, there is no reason to conclude that the ATF's decision to treat attachments as a separate document undermined the "integrity" of the responsive records. Thus, on the facts of this case, the Court concludes that the ATF reasonably—and lawfully—decided to treat wholly unrelated attachments as separate records. To the extent the Brady Center seeks any of those attachments, it can always submit a FOIA request that identifies the particular attachment it seeks.

**B.      Warning Letter Request**

In contrast to the parties' motions regarding the White Paper Request—which address all issues relevant to that request—the parties have briefed only a single question with respect to the Warning Letter Request: whether the ATF properly redacted the number of times in which a federal firearms licensee committed a particular regulatory violation pursuant to FOIA Exemption 3. *See, e.g.*, Dkt. 17-2 at 28; Dkt. 24 at 21; Dkt. 22 at 26.

The Warning Letter Request seeks "warning letters, warning conference notices, and the underlying reports of violated and firearms inspection narrative reports, issued to federal firearms licensees," along with "notices of revocation of license[s] and the accompanying ATF Form 4500s issued to federal firearms licensees." Dkt. 1-3 at 2. Although the ATF has not yet completed its review and production of responsive records, it has released hundreds of pages of

ATF firearms inspection reports.  Dkt. 16-2 at 2–3 (Kil Decl. ¶ 7–9).  Those pages include

numerous redactions, including redactions marked: "(b)(3)—Public Law 112-55 (125 Stat.

552)."  *See, e.g.*, Dkt. 17-8 at 25–30.  The ATF has explained that it made those redactions

pursuant to the FOIA Exemption 3 and the Tiahrt Rider.  See Dkt. 16-2 at 4–7 (Kil Decl. ¶¶ 14–

20).

FOIA Exemption 3 protects records that are "specifically exempted from disclosure by

statute . . . if that statute—(A)(i) requires that the matters be withheld from the public in such a

manner as to leave no discretion on the issue; or (ii) establishes particular criteria for withholding

or refers to particular types of matters to be withheld; and, (B) if enacted after the date of

enactment of the OPEN FOIA Act of 2009, specifically cites to this paragraph."  5 U.S.C.

§ 552(b)(3).  According to the ATF, the Tiahrt Rider is such a statute.  Congress has attached the

rider to various appropriations bills and continuing resolutions between 2003 and 2012.  *See*

*Everytown for Gun Safety Support Fund v. Bureau of Alcohol, Tobacco, Firearms and*

*Explosives*, No. 18-cv-2296, 2019 WL 3890220, at *3 (S.D.N.Y. Aug. 19, 2019).  As adopted in

the Consolidated and Further Continuing Appropriations Act of 2012, Pub. Law 112-55, Nov.

18, 2011, 125 Stat. 552, the Tiahrt Rider provides, in relevant part:

> That, during the current fiscal year and in each fiscal year thereafter, no funds
> appropriated under this or any other Act may be used to disclose part or all of
> the contents of the Firearms Trace System database maintained by the National
> Trace Center of the Bureau of Alcohol, Tobacco, Firearms and Explosives or
> any information required to be kept by licensees pursuant to section 923(g) of
> title 18, United States Code, or required to be reported pursuant to paragraphs
> (3) and (7) of such section, except to [various law enforcement and national
> security agencies].

Although included in various, annual appropriations, the Tiahrt Rider contains language of

permanence—that is, "in each fiscal year thereafter."  *Id.*

The record-keeping provision referenced in the Tiahrt Rider requires federally licensed "importer[s]," "manufacturer[s]," and "dealer[s]" to maintain "records of importation, production, shipment, receipt, sale, or other disposition of firearms" pursuant to regulations promulgated by the Attorney General. 18 U.S.C. § 923(g)(1). Those regulations, in turn, make it unlawful to sell any firearm to any person who is not also a licensee without completing an ATF Form 4473 concerning the transaction. 27 C.F.R. § 478.124. Licensees are also required to respond to requests from the Attorney General for information contained within these records to aid "a bona fide criminal investigation." 18 U.S.C. § 923(g)(7). Licensees are separately required to "prepare a report of multiple sales or other dispositions" whenever a they make two or more sales over a five-day period to "an unlicensed person." *Id.* § 923(g)(3).

Taking all of this together, the ATF contends that (1) the "warning letters, warning conference notices, . . . the underlying reports of violations and firearms inspection narrative reports," and "notices of revocation of license and accompanying ATF Form 4500s" that the Brady Center is seeking, Dkt. 1-2 at 2, include "information required to be kept . . . or[ ]report[ed]" pursuant to § 923(g); (2) the Tiahrt Rider precludes the agency from disclosing that information; and (3) the agency, therefore, appropriately redacted the information at issue pursuant to FOIA Exemption 3. Finally, the ATF represents that, for "a number of years," it has construed the Tiahrt Rider to permit it to release firearms inspection reports, including information regarding specific violations committed by a federal licensee, so long as "the *associated number of times each violation occurred* [has been] redacted." Dkt. 16-2 at 7 (Kil Decl. ¶ 19) (emphasis added). For present purposes, all that is at issue is whether the ATF permissibly invoked FOIA Exemption 3 to redact that specific information from the records the Brady Center sought in the Warning Letters Request.

1.      *Adequacy of the ATF's Description of the Redactions*

As an initial matter, the Court must determine whether it can resolve that question on the present record.  The Brady Center, for its part, argues that the ATF "has moved for summary judgment . . . without providing the Court with sufficient basis to assess the application of Exemption 3."  Dkt. 17-2 at 26.  The Brady Center, in particular, faults the ATF for failing "to produce a *Vaughn* index to accompany the redacted documents," *id*., or at least "a robust declaration that tied detailed descriptions of the categories of redacted information to specific sections of the redacted ATF forms, explaining how certain fields on the form were tied to specific information exempted from release by Section 923(g) or derived from the e-Trace database," Dkt. 24 at 20.  The ATF responds—not unfairly—that it was the Brady Center that asked the Court to address the applicability of the Tiahrt Rider before the ATF had completed its production because "'the[ ]redactions at issue are . . . repetitive and not fact specific,'" leaving the ATF "whipsaw[ed]" between the Brady Center's assurance that the issue was not fact dependent and was ripe for early decision and its demand for greater factual detail.  Dkt. 22 at 22 (quoting Dkt. 13 at 6–7).  But, in any event, the ATF now takes the position that the Kil Declaration adequately describes the basis for the redactions to permit the Court to determine whether the Tiahrt Rider precludes release of the information at issue.  *Id.*

After reviewing the sample records and redactions the parties have filed, the Court concludes that both the Brady Center and the ATF have a point.  There are many redactions that the Court cannot decipher on the present record.  At times, for example, the ATF has redacted multiple, consecutive paragraphs, across many pages, and, at other times, it has redacted entire paragraphs based on more than one FOIA exemption, without indicating which redactions correspond with which exemption.  *See, e.g.*, Dkt. 24-3 at 12–17; Dkt. 24-4 at 6–16; Dkt. 24-5 at

20

3–5.  At other times, however, the Court can discern the nature of the redaction from the document itself.  One Report of Violation, for example, notes: "Failure to enter into a record each receipt and every disposition of individual firearms, [REDACTED] instances."  Dkt. 17-7 at 22.  Another notes: "Failure to report the multiple sales of rifles or submission untimely on [REDACTION].  Dkt. 17-7 at 11.  And yet another notes: "While reviewing the licensee's records it was discovered that the licensee failed on [REDACTED] occasions to timely report a Multiple Sale or Other Disposition of Pistols and Revolvers on an ATF F3310.4 [REDACTED] firearms."  Dkt. 17-7 at 49.

When combined with the declarations the ATF has filed in support of its motion, the Court can reasonably discern the nature of some—but not all—of the redactions.  From the Kil Declaration and the text of many of the redacted records, the Court understands that the ATF redacted information derived from records that licensees were required to maintain under 18 U.S.C. § 923(g) regarding the "number of times each [regulatory] violation occurred."  Dkt. 16-2 at 7 (Kil Decl. ¶ 19).  The Second Chisholm Declaration further explains the ATF's redaction policy with the following examples:

> For example, an FFL [Federal Firearms Licensee] may have a violation for incorrectly filling out an ATF Form required by Federal law.  An ATF's Industry Operations Investigator (IOI) analyzing the Form will document how many instances a specific FFL made a particular error and notate that on the Firearms Inspection Report. . . .  That general conclusion—that there is an error in filling out ATF Form 4473 or other required records—is released under FOIA.  ATF does not release, however, the fact that a particular FFL made this same type of error a specific number of times.  For example, the information that a specific FFL filled out ten ATF Forms with the same error is information derived solely from the statutorily required information.

> . . . .  In addition, IOI's often transcribe specific information directly from these forms into the Firearms Inspection Reports.  This may include information about the purchaser or the firearm purchased.  All of this, either the aggregate numbers for a specific FFL or the specific information from a specific FFL,[ ]is derived

directly from "information required to be kept by licensees pursuant to section 923(g) of title 18, United States Code, or required to be reported pursuant to paragraphs (3) and (7) of such section."

[In addition,] portions of the records were redacted as a result of information being obtained directly from eTrace, also known as the Firearms Trace System Datasbase (FTS). eTrace or FTS data is routinely utilized by IOIs to gain insight into how many firearms traces or multiple sales have originated from a particular FFL.

Dkt. 22-2 at 9–11 (Second Chisholm Decl. ¶¶14–17).

Based on this evidence and the parties' description of the issue that they have briefed for decision, the Court will address—in general—whether the ATF permissibly "redacted the *number* of times a licensee committed a particular [regulatory] violation." Dkt. 24 at 21. But, the Court leaves for another day the determination whether each particular redaction of the number of violations was proper; the determination whether the ATF permissibly redacted any other information pursuant to the Tiahrt Rider and FOIA Exemption 3; and resolution of any dispute regarding which of the redactions at issue fall within that category. Before the Court can address these additional questions, the Court will require greater detail—including either a detailed *Vaughn* Index or a declaration that addresses the redactions on a document-by-document basis, as well as further briefing by the parties. The Court may also, if appropriate, require that the ATF provide the Court with unredacted versions of the relevant records for *ex parte*, in camera review. *See* 5 U.S.C. § 552(a)(4)(B) (providing courts the authority to review withheld or redacted agency records "in camera" as part of its *de novo* review of those withholdings).

### 2.    *Application of the Tiahrt Rider to the Number of Violations Noted*

In addition to challenging the adequacy of the ATF's description of the redactions at issue, the Brady Center challenges the ATF's view that the Tiahrt Rider bars disclosure of the

number of violations noted in the firearms inspection reports.[3]  The Brady Center first argues

that the ATF's decision to release information relating to the nature of the regulatory violation is

inconsistent with its decision to withhold information reflecting the number of violations.  Dkt.

24 at 22–23.  As a result, the Brady Center contends that ATF's redaction policy is "arbitrary,"

*id.* at 23; that the ATF has applied its disclosure "policy in an inconsistent and selective manner,"

*id.*; that the ATF "concocted [a] *post hoc* litigation position," *id*. (emphasis added), and that the

ATF cannot "rely on an undisclosed policy to justify its withholding," *id.* at 24.  Each of these

arguments sounds in the requirements of the Administrative Procedure Act ("APA"), 5 U.S.C.

§ 701 *et seq.*, that an agency engage in reasoned decision-making, *see, e.g.*, *Motor Vehicle Mfrs.*

*Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52–53 (1983), and that the

agency defend its position based solely on the administrative record, *see, e.g.*, *Sec. & Exch.*

*Comm'n v. Chenery Corp.*, 318 U.S. 80, 87 (1943).  The problem is that the Brady Center has

brought a FOIA case, not an APA case, and the Brady Center does not cite a single case applying

the APA's arbitrary and capricious standard to the FOIA.  Nor is the Court aware of any such

---

[3]  Although neither the Brady Center's motion for partial summary judgment nor its opposition to the ATF's motion disputes the premise that the Tiahrt Rider constitutes a statute that specifically exempts records from disclosure for purposes of FOIA Exemption 3, *see* Dkt. 22 at 25 ("[P]laintiff does not dispute that the [Tiahrt Rider] qualifies as an Exemption 3 statute"), it recently filed a Notice of Supplement Authority directing the Court's attention to a decision from the United States District Court for the Southern District of New York holding that the Tiahrt Rider lacks the express reference to Exemption 3 required for statutes enacted after Congress adopted the OPEN FOIA Act of 2009.  *See* Dkt. 29 at 1–2 (citing *Everytown for Gun Safety Support Fund*, 2019 WL 3890220, at *5).  In raising that argument for the first time in the Notice of Supplemental Authority, the Brady Center does not grapple with the cases from this district that have concluded that the Tiahrt Amendment qualifies as an Exemption 3 statute.  *See, e.g.*, *Abdeljabbar v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 74 F. Supp. 3d 158, 176 (D.D.C. 2014); *Higgins v. U.S. Dep't of Justice*, 919 F. Supp. 2d 131, 145 (D.D.C. 2013).  Given that the Brady Center only belatedly and cursorily raised the argument, the Court concludes that it is forfeited.  *See Kennedy-Jarvis v. Wells*, 195 F. Supp. 3d 230, 238 n.4 (D.D.C. 2016) (finding an argument forfeited where it is "raised for the first time in a reply brief").

principle.  To the contrary, nothing *in the FOIA* precludes agencies from releasing exempt

records, and nothing *in the FOIA* requires that the agency adopt a consistent policy.  Unlike the

APA, moreover, review in FOIA cases is *de novo*, 5 U.S.C. § 552(a)(4)(B), and the agency's sole

burden is to justify its withholdings based on the relevant facts and the exemptions specified in

the statute, *id.*

      The Brady Center also at least gestures at the contention that the Tiahrt Rider protects the

reports licensees are required to keep or to submit pursuant to 18 U.S.C. § 923(g), but does not

protect documents, like those at issue here, that contain information merely derived from the

§ 923(g) reports.  To the extent the Brady Center makes that argument, it is unconvincing.  The

text of the Tiahrt Rider is clear:  it prohibits the expenditure of appropriated funds "to disclose . .

. any information required to be kept by licensees pursuant to [§ 923(g)] or required to be

reported pursuant to paragraphs (3) and (6) of such section."  125 Stat. at 609.  The choice of the

word "information," as compared to "records" or "forms," leaves little doubt that the Rider

reaches derivative records.  The modifier "any," moreover, confirms that the Rider extends to

documents that merely contain—and thus "disclose"—information that licensees are required to

keep pursuant to 18 U.S.C. § 923(g).  *See United States v. Gonzalez*, 520 U.S. 1, 5 (1997) ("Read

naturally, the word 'any' has an expansive meaning, that is, 'one or some indiscriminately of

whatever kind'" (quoting Webster's Third New International Dictionary 97 (1976))).

      The Brady Center also argues that the records at issue here are not covered by the Tiahrt

Rider because they fall within the Rider's exception for "aggregate statistical data."  Dkt. 17-2 at

33–34.  That exception provides that the Rider "shall not be construed to prevent: . . . the

publication of . . . statistical aggregate data regarding firearms traffickers and trafficking

channels, or firearms misuse, felons, and trafficking investigations."  125 Stat. at 610.  The

Brady Center's argument depends on the unsupported, but uncontested, premise that all it must show to prove that the records fall within this exemption is that the data is "statistical aggregate data." It is far from clear, however, that the records at issue here, which largely concern recordkeeping violations by licensed firearms dealers, are properly understood to reflect data "regarding firearms traffickers and trafficking channels, or firearms misuse, felons, and trafficking investigations." *Cf. Nat'l Shooting Sports Found., Inc. v. Jones*, 840 F. Supp. 2d 310, 314 (D.D.C. 2012) ("Multiple purchases of firearms by a non-licensee provide a significant indicator of firearms trafficking.")

But, even putting that difficulty with the Brady Center's argument aside, the text of the Tiahrt Rider does not support the Brady Center's argument. First, the Court is unconvinced that the number of violations committed by a particular licensee constitutes "statistical aggregate data" for purposes of the Tiahrt Amendment's exception. For one thing, the Rider speaks in the plural—it refers to "traffickers," "trafficking channels," and "trafficking investigations"—while the reports at issue here are, at least as far as the Court can tell, each about a single licensee. Moreover, it is far from clear that the number of violations of a particular type committed by a single licensee constitutes "statistical data"—the word "statistical" connotes the use of "the principles of statistics," Statistical, Merriam-Webster Dictionary Online, available at https://www.merriam-webster.com/dictionary/statistical, and "statistics" is "a branch of mathematics dealing with the collection, analysis, interpretation, and presentation of masses of numerical data," Statistics, Merriam-Webster Dictionary Online, available at https://www.merriam-webster.com/dictionary/statistics. There is no reason to conclude, for example, that the ATF investigators are measuring probabilities, deviations from the mean, or the relationship between data sets. But, even if the Court were to construe the phrase "statistical

data" liberally, reading the statutory phrase "aggregate statistical data" in the manner the Brady Center suggests would read the word "aggregate" entirely out of the statute. And, that, the Court may not do. *See Obduskey v. McCarthey & Holthus LLP*, 139 S. Ct. 1029, 1037 (2019) ("[Courts] generally presume[e] that statutes do not contain surplusage." (quoting *Arlington Central Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291. 299 n.1 (2006)).

This, then, brings the Court to the ultimate question: whether ATF's redactions of numbers of violations "disclos[e]" "any information required to be kept [or reported] pursuant to Section 923(g)." 125 Stat. at 609. The answer to that question, in turn, will require a redaction-by-redaction review of the records and, at least with respect to many redactions, will require further facts and further briefing by the parties. Upon review of the sample records and redactions the Brady Center has filed, however, the Court can conclude that at least some of the redactions are proper.

Most clearly, a number of the redactions appear to omit information that the ATF obtained directly from the records subject to the Tiahrt Rider. The regulations implementing the record-keeping requirements § 923(g) provide that a "licensed dealer shall retain . . . each Form 4473 obtained in the course of transferring custody of the firearm[]." 27 C.F.R. § 478.124 (b). Form 4473, in turn, records each firearms transaction, including the name and residence of the purchaser, the type of firearm transferred (i.e., handgun, long gun, or other firearm), and whether a background check was performed. Those record-keeping requirements map neatly onto some of the redactions at issue. One record, for example, lists as a violation: "Transfer of a long gun to an out-of-state resident in violation of Indiana State Law [REDACTED] involving [REDACTED]," Dkt. 17-7 at 13. It is the Form 4473 that would have recorded the sale of "a long gun" and the residence of the purchaser. Another redacted report of a violation states:

"[t]he licensee failed on [REDACTED] occasions to *timely report* a Multiple Sale or Other Disposition of Pistols and Revolvers on an ATF F[orm ] 3310.4 [REDACTED] firearms."  Dkt. 17-7 at 49 (emphasis added).  Again, the Court can reasonably infer from the redaction and from the ATF's declaration that the ATF determined the number of sales from examining the relevant Forms 4473.  The Court can also conclude, more generally, the ATF has permissibly redacted information that was derived directly from the Forms 4473 or like forms, that it reviewed in the course of the relevant inspections.  It is premature, however, to decide which of the many redactions at issue fall into this category.

A second set of sample records—and, indeed, the largest set of redactions—poses a more difficult question, which is not addressed in any detail in the parties' briefs: whether a finding that the licensee or purchaser failed to include required information on a Form 4473 or like report, or failed to create and maintain the required report, constitutes "information required to be kept by licensees pursuant to section 923(g)."  125 Stat. at 609.  One can imagine a number of possible responses to this question.  One might argue, for example, that the absence of information is not information.  Alternatively, one might argue that the absence of at least certain information reveals information that the licensee is required to maintain by virtue of § 923(g).  A "[f]ailure by licensee to date the ATF Form 4473" or the number of occasions the licensee failed to complete "questions 34 and/or 36" on Form 4473 or "incorrect[ly]" answered those questions, *see* Dkt. 17-8 at 20, at least indirectly reveals information that the firearms dealer did maintain pursuant to § 923(g)—that is, licensees are required to maintain a Form 4473 for each transaction, and the existence of the Form 4473, even if incompletely or incorrectly completed, discloses the existence of the sale, as documented in the Form 4473.  Or, one might even argue that the Rider, read literally, applies to information the licensee is "required to" keep, even if it

fails to do so. Resolution of the question whether each redaction of a failure-to-report violation requires resolution of these legal questions and, even more importantly, will likely turn on context.

Finally, the sample redactions reveal other occasions where the Court cannot, on the present record, reasonably discern whether the information at issue came from a Form 4473, a similar form subject to § 923(g), the eTrace database, a combination of these sources, or some other source. The existing record, accordingly, leaves the Court with an information deficit on two different fronts. First, the Court has little guidance from either party about how broadly it should understand the Rider's prohibition on "disclosure" to sweep—or even how it should answer that question. Second, without the *Vaughn* index or a detailed declaration, the Court cannot determine how much of an inferential or investigative step would be needed to take a particular piece of redacted information and trace it back to particular "information required to be kept by licensees pursuant to section 923(g)" or to information gleaned from the eTrace database.

As a result, the Brady Center is correct that the Court cannot, on the existing record, resolve the parties' pending cross-motions for summary judgment with respect to the ATF's reliance on FOIA Exemption 3 and the Tiahrt Rider. The ATF, moreover, is still producing records, which may contain additional types of reports of violations that confound the question even further. The Court will, accordingly, deny both parties motions for summary judgment with respect to the relevant redactions, without prejudice. Insofar as the parties cannot reach agreement as to the scope of ATF's redactions under Exemption 3, the parties may renew their motions after the ATF prepares a detailed *Vaughn* index or the equivalent, which, among other things, explains whether and to what extent the purported disclosure of § 923(g) information is

inferential or direct, as well as which specific recordkeeping requirements preclude the release of the redacted information.

## CONCLUSION

For the foregoing reasons, Defendants' motion for partial summary judgment, Dkt. 16, and Plaintiff's cross-motion for partial summary judgment, Dkt. 17, are both hereby **GRANTED** in part **DENIED** in part.

**SO ORDERED**.


_/s/ Randolph D. Moss_
RANDOLPH D. MOSS
United States District Judge


Date:  September 28, 2019